Case No. 25-50886

---

# In the United States Court of Appeals
For the Fifth Circuit

---

Alexis Tovar, Individually and as Next Friend of D.P., a Minor; Phillip Reyes, as Next Friend of A.R. and J.R., Minors,

Plaintiffs-Appellants

v.

City of San Antonio; Eleazar Alejandro, San Antonio Police Officer,

Defendants-Appellees

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION
CIVIL ACTION NO.  5:23-cv-00847-FB

---

BRIEF OF APPELLANTS ALEXIS TOVAR, INDIVIDUALLY AND AS NEXT
FRIEND OF D.P., *A MINOR,* AND PHILLIP REYES, AS NEXT FRIEND OF
A.R. AND J.R., *MINORS,* OF THE TRIAL COURT'S ORDER GRANTING
DEFENDANTS' 12(B)(6) MOTION TO DISMISS PLAINTIFFS' THIRD
AMENDED COMPLAINT

DANIEL W. PACKARD
The Packard Law Firm
1100 NW Loop 410, Suite 100
San Antonio, Texas 78213
(210) 340-8877
(210) 340-8787 Facsimile
Email:  Dan@packardfirm.com
        Tayler@packardfirm.com
ATTORNEY FOR APPELLANTS

**ORAL ARGUMENT REQUESTED**

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Alexis Tovar, individually and as next friend of D.P., a minor, and Phillip Reyes, as next friend of A.R. and J.R., minors — Plaintiffs/Appellants

2. Daniel W. Packard
   The Packard Law Firm
   1100 NW Loop 410, Suite 100
   San Antonio, Texas 78213
   P: (210) 340-8877
   Email: Dan@packardfirm.com — Attorney for Appellants

3. Alfred Flores, Eleazar Alejandro, and The City of San Antonio, Texas — Defendants/Appellees

4. Laura Macom
   Langley & Banack, Inc.
   745 E. Mulberry Ave., 7th Floor
   San Antonio, Texas 78212
   P: (210) 736-6600
   Email: lmacom@langleybanack.com — Attorney for Appellee The City of San Antonio, Texas

5. Elizabeth Guerrero-Southard
   Assistant City Attorney
   203 S. St. Mary's St., 2nd Floor
   San Antonio, Texas 78205
   P: (210) 207-2108
   Email: Elizabeth.Guerrero-Southard@sanantonio.gov — Attorneys for Appellee The City of San Antonio, Texas

2

Mark Kosanovich
Fitzpatrick & Kosanovich, P.C.
PO Box 831121
San Antonio, Texas 78283-1121
P: (210) 408-6793
Email:
mark.kosanovich@sanantonio.gov

|   |   |   |
|---|---|---|
| 6. | Stephen B. Barron<br>Blair J. Leake<br>Wright & Greenhill, P.C.<br>4700 Mueller Blvd., Suite 200<br>Austin, Texas 78723<br>P: (512) 476-4600<br>Email: sbarron@w-g.com<br>bleake@w-g.com | Attorneys for Appellees<br>Alfred Flores and<br>Eleazar Alejandro |

Dated:       January 14, 2026

s/Daniel William Packard
Daniel W. Packard, Attorney of record for Appellants

## **STATEMENT REGARDING ORAL ARGUMENT**

Pursuant to Federal Rules of Appellate Procedure, 34(a) and Local Rule 28.2.3 and 34.2, Counsel for Appellants respectfully states that oral argument is necessary in this Appeal.  Appellants assert that this case presents an issue on the qualified immunity analysis and oral argument would benefit the Court.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PARTIES .........................................................2

STATEMENT REGARDING ORAL ARGUMENT ................................................4

TABLE OF CONTENTS...........................................................................................5

TABLE OF AUTHORITIES ....................................................................................7

STATEMENT OF JURISDICTION.........................................................................10

ISSUES PRESENTED FOR REVIEW ....................................................................11

STATEMENT OF THE CASE..................................................................................12

SUMMARY OF THE ARGUMENT .......................................................................21

ARGUMENT .............................................................................................................25

I.    Legal Standard and Standard of Review ...........................................................25

II.    The Trial Court Erred in Finding That Plaintiffs Have Not Sufficiently
Alleged a Constitutional Violation. ..........................................................................26

    A. Legal Framework for Excessive Force Cases..................................................26

    B. The Trial Court Erred in Concluding That Plaintiffs Have Not Alleged a
    Constitutional Violation...............................................................................28

        1.    In finding that Plaintiffs have not alleged a Constitutional violation, the
        Trial Court made factual conclusions that are inconsistent with Plaintiffs'
        allegations and with the BWC. ..................................................................29

2.   The Trial Court's Order Did Not Fully Evaluate the Totality of the
Circumstances. ..........................................................................................................37

III. The Officer Defendants' Actions Violated Clearly Established Law. ..............39

    A. The Rule Articulated in *Graham* and *Garner* is Sufficient Because This is a
    "Clear" or "Obvious" Case.............................................................................39

B. Assuming, *Arguendo*, That a Rule More Specific Than the Rule in *Graham* and *Garner* is Needed, Plaintiffs Have Alleged Three Rules of Law That Would Have Placed the Officer Defendants on Notice That Their Actions Violated Clearly Established Law. ...................................................................................44

C.   The City's Prior Training and The Response By San Antonio Policy Makers Demonstrate That the Law Prohibiting the Use of Lethal Force in This Case Was Clearly Established at the Time the Shooting Occurred.......................................47

IV.   The Case Against the City of San Antonio, Texas Should Not be Dismissed. ...............................................................................................................51

CONCLUSION ...........................................................................................................51

CERTIFICATE OF SERVICE ..................................................................................53

CERTIFICATE OF COMPLIANCE ........................................................................54

# TABLE OF AUTHORITIES

**Cases**

*Amador v. Vasquez*,
961 F.3d 721 (5th Cir. 2020) ....................................................................46

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................25

*Bacque v. Leger*,
207 F. App'x 374 (5th Cir. 2006) ...............................................................46

*Barnes v. Felix*,
605 U.S. 73, 145 S. Ct. 1353, 221 L. Ed. 2d 751 (2025)...................... 22, 27, 28, 37

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................25

*Brooks v. Taylor County*,
2021 WL 4458380 (N.D. Texas, Abilene Div., Sept.,29, 2021) ...........................47

*Carter v. Diamond URS Huntsville, LLC*,
175 F. Supp. 3d 711 (S.D. Tex. 2016) ..........................................................27

*Cole v. Carson*,
935 F.3d 444 (5th Cir. en banc 2019) ..........................................................40

*Crane v. City of Arlington, Texas*,
50 F.4th 453 (5th Cir. 2022) .............................................................. 24, 27, 40, 45

*Darden v. City of Fort Worth, Tex.*,
880 F.3d 722 (5th Cir. 2018) .....................................................................26

*Davis v. Scherer*,
468 U.S. 183 (1984)..................................................................................50

*Deville v. Marcantel*,
567 F.3d 156 (5th Cir. 2009) .....................................................................27

*Dorsey v. Portfolio Equities, Inc.*,

540 F.3d 333 (5th Cir. 2008) ...............................................................................25

*Graham v. Connor*,
490 U.S. 386 (1989) .................................................................................... 27, 40

*Groh v. Ramirez*,
540 U.S. 551 (2004) ...........................................................................................48

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) ...........................................................................................48

*Harmon v. City of Arlington, Tex.*,
478 F. Supp. 3d 561 (N.D. Tex. 2020), aff'd, 16 F.4th 1159 (5th Cir. 2021)..........27

*Hart v. Texas Dept. of Criminal Justice*,
106 Fed.Appx. 244 (5th Cir. 2004)...................................................................49

*Hope v. Pelzer*,
536 U.S. 730 (2002) .................................................................................. 48, 49, 50

*Lytle v. Bexar Cty., Tex.*,
560 F.3d 404 (5th Cir. 2009) ...................................................................... 40, 44, 46

*Mace v. City of Palestine*,
333 F.3d 621 (5th Cir. 2003) .............................................................................28

*Mason v. Lafayette City-Par. Consol. Gov't*,
806 F.3d (5th Cir. 2015) ............................................................................. 40, 44

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)...........................................................................................25

*Oliver v. Arnold*,
19 F.4th 843 (2021)............................................................................................49

*Pineda v. West Texas Community Supervision*,
2020 WL 466052, (W.D. Texas, 2020) ..............................................................42

*Reyes v. Bridgwater*,
362 F. App'x 403 (5th Cir. 2010) ................................................................. 40, 46

8

*Rockwell v. Brown*,
664 F.3d 985 (5th Cir. 2011) ................................................................28

*Roque v. Harvel*,
993 F.3d 325 (5th Cir. 2021) .................................................. 26, 40, 44

*Taylor v. Riojas*,
592 U.S. 7 (2020) ..................................................................................41

*Tennessee v. Garner*,
471 U.S. 1 (1985) ............................................................... 27, 40, 41

*Valigura v. Mendoza*,
2006 WL 4072061 (S.D. Texas, Oct. 30, 2006) ............................... 48, 49

*White v. Pauly*,
580 U.S. 73 (2017) ................................................................................28

*Winder v. Gallardo*,
118 F.4th 638 (5th Cir. 2024) ...............................................................26

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction under 28 U.S.C. Section 1291 because the District Court entered a Judgment dismissing all claims and all parties. (ROA.786).  The Order appealed from is the District Court's Opinion and Order Granting Defendants' Rule 12(b)(6) Motion to Dismiss on qualified immunity grounds and dismissing the action with prejudice, which constitutes a final, appealable judgment.

The District Court had subject matter jurisdiction under 28 U.S.C. Section 1331 because Plaintiffs'/Appellants' claims arise under the Constitution and laws of the United States, including 42 U.S.C. Section 1983.  Plaintiffs/Appellants timely appealed by filing their notice of appeal. (ROA.786-791).

## ISSUES PRESENTED FOR REVIEW

**Appellants' Issue #1**

Whether or not the Honorable District Court erred in finding that Plaintiffs have not plausibly alleged a Constitutional violation when the Complaint alleges that the Officer Defendants fatally shot Ms. Perez when she moved towards a locked door with a raised hammer, and the Officer Defendants knew that the door was locked and knew that Ms. Perez could not harm anyone with the hammer behind the locked door.

**Appellants' Issue #2**

Whether or not the Honorable District Court erred when it concluded that Plaintiffs have not plausibly alleged a violation of clearly established law when the Complaint identifies multiple prior cases prohibiting the use of deadly force unless the victim presents an imminent threat to life or serious bodily injury, when the victim is functionally unarmed, when the victim is too far away to prevent harm, when the police could have used non-lethal means and/or safely retreat and/or when high ranking City officials have condemned the shooting as against established police training.

**STATEMENT OF THE CASE**

## I.    Course of the Proceedings and Disposition in the Court Below

This case arises out of the tragic events that occurred on June 23, 2023, when Defendants Flores and Alejandro (hereinafter "Officer Defendants") fatally shot Melissa Perez (hereinafter "Perez") while she was in her own apartment behind a locked door.  Perez left behind one adult daughter and three minor children, who are the Plaintiffs in this case alleging a §1983 cause of action for excessive force. Plaintiffs also alleged a *Monell* cause of action against the City of San Antonio, Texas.  Plaintiffs' operative Complaint is the Third Amended Complaint (hereinafter the "Complaint").

On November 9, 2023, the Officer Defendants filed a Rule 12(b)(6) Motion to dismiss Plaintiffs' Second Amended Complaint based on qualified immunity. (ROA.141-155). After the issue was fully briefed, the Court ruled that the Plaintiffs had properly alleged a constitutional violation because, *inter alia*, the Officer Defendants "had time to safely extricate themselves from the situation through retreat" (ROA.396), because they had "extra time to cover to consider and pursue other, nonlethal means of incapacitating Perez" (*Id.*), and because there was no "pressing need to incapacitate Perez *immediately*; she was alone in her apartment and separated from the Officer Defendants and other officers by physical barriers." (ROA.397, emphasis in original).  Thus, the Court concluded, "a reasonable officer

12

in the Officer Defendants' shoes would not have believed that Perez posed an immediate threat of serious physical harm when they shot her. The decision to 'eschew lesser responses' and immediately incapacitate Perez by shooting her through the protective barriers was, therefore, an excessive use of force." (*Id.*)

With respect to the "clearly established" prong of the test, the Court ruled against Plaintiffs subject to an opportunity to re-plead. In reaching this conclusion, the Court noted that it was unable to find any controlling authority clearly establishing that it was constitutionally impermissible to shoot and kill "a mentally unstable suspect armed with a weapon like a hammer, ***repeatedly rushing at the officer*** while separated by barriers ***that more-or-less readily can be broken or removed***." (ROA.401, emphasis added). In granting Plaintiffs leave to amend, the Court noted that, if the allegation that Perez charged the officers were removed from the Complaint, then that "could substantially affect the 'clearly established' prong of the qualified immunity analysis." (*Id.*)

In response to the Order, Plaintiffs filed their Third Amended Complaint ("Complaint"). (ROA.498-548). The additional factual allegations in the Complaint clarified that there were barriers between Perez and the officers that were not easy to remove, and which prevented contact between Perez and the officers. (ROA.502). The Complaint further clarified that Perez could not have reached the officers while the door was closed and, importantly, the Officer Defendants knew the door was

13

locked when they fired the fatal rounds. Thus, the Complaint alleged that despite Perez' movement towards the door with a raised hammer, no reasonable officer would have believed that Perez presented an imminent threat because they all knew that Perez was behind a locked door when they shot and killed her.  All the Defendants then filed a Rule 12(b)(6) Motion to dismiss based on qualified immunity. (ROA.549-568; ROA.572-600). As part of their Motion, the Officer Defendants attached extensive body camera footage ("BWC") from the incident. (ROA.596-599).  Regarding the BWC footage, Plaintiffs informed the Court that they had never received a copy of the BWC until Defendants attached it to their Motion and that they did not object to the Court considering the BWC footage when evaluating the merits of the Motion.

On May 28, 2025, The Honorable Magistrate Judge Henry Bemporad recommended that the case be dismissed, concluding (1) that Plaintiffs had not alleged a Constitutional violation and (2) even if a Constitutional violation had been alleged, that the Officer Defendants did not violate clearly established law. *see* (ROA.737-757). The Honorable Judge Fred Biery accepted and adopted the recommendation without any elaboration in his Order dismissing the case dated September 28, 2025.[1] (ROA.782-784).  Plaintiffs then filed this appeal contending

---

[1] Since the Report and Recommendation details the Court's analysis, both the Report and Recommendation and the Court's Order adopting such shall be collectively referred to as the "Trial Court's Order".

14

that the Officer Defendants are not entitled to qualified immunity because the Plaintiffs have properly alleged a Constitutional violation and that the Officer Defendants' conduct as alleged in the Complaint violated clearly established law.

## II.   Statement of Facts

The facts summarized below cite the Complaint and also reference some important facts captured by the BWC footage that the Officer Defendants attached to their Rule 12(b)(6) Motion.

In the late hours of June 22, 2023, Perez was suffering from a schizophrenic episode. (ROA.500). She was at home when it happened, at the Rosemont at Miller's Pond Apartments, in San Antonio, Texas. (*Id.*) In the throes of that episode, Perez was cutting the wires to fire alarms at the apartment complex, believing the FBI was using them to spy on her. (*Id.*) The San Antonio Fire Department ("SAFD") responded to a call about Perez and made contact with her in the parking lot of the complex. (*Id.*) Perez identified herself and explained why she was destroying the fire alarms. (*Id.*) SAFD reported the incident to the San Antonio Police Department ("SAPD"). (*Id.*)

SAPD officers arrived at the apartment complex on June 23, 2023, at around 12:27 A.M. and made contact with Perez in the parking lot. (*Id.*) She again identified herself and explained the reasons for her actions. (*Id.*) At some point during the encounter, Perez began to move toward her apartment. (*Id.*) When one of the officers

15

ordered her to stay put, she fled into her apartment and locked the door behind her. (*Id.*) After she refused the officers' orders to come out, the officers called for backup. (*Id.*)

At around 1:40 A.M., at least eight additional SAPD officers arrived at Perez' apartment. (ROA.501). One group of officers remained at the front door; the rest positioned themselves by the rear patio. (*Id.*) One of the officers removed a screen from an open window and began to reach into the apartment, at which point Perez threw a candle at him. (ROA.502).[2] The officer unholstered his pistol and told Perez, "you're going to get shot," to which she responded, "shoot me!" (*Id.*) The officers then backed away from the window and waited for about 20 minutes while additional officers arrived. (*Id.*)

After reinforcements arrived, the officers communicated with Perez through the window, which was blocked by a large TV such that Perez could not exit the apartment through the window. (*Id.*) The BWC footage confirms that the heavy TV was blocking the window such that she could not have climbed out of the window without moving the TV and shows Perez leaning on the TV to talk to the officer through the window. (ROA.599:01:51:00). The locked back patio door was

---

[2] The Complaint alleges that it is unclear whether the candle actually struck the officer, and the BWC does not capture whether it did or did not, but the BWC does capture a discussion afterwards where the officer claimed that the candle made contact with his left forearm. (ROA.502; ROA.597: 01:48:25 – 01:48:38).

16

constructed with wood or metal windowpanes that were small enough to make it physically impossible for a hammer to get through the door as long as it was closed-even if the glass were broken. (ROA.502-503; ROA.597:02:01:43; ROA.598:02:02:17 – 02:02-33).

Additional SAPD reinforcements arrived on the scene starting about 1:48 A.M. (ROA.598:01:48:00). Among them were the Officer Defendants Sergeant Alfred Flores and Officer Eleazar Alejandro. Officer Nathaniel Villalobos and several other SAPD officers were also present. (ROA.502). After being briefed on the situation, the Officer Defendants approached the back of Perez' apartment. (*Id.*). At about 1:51 am, Officer Villalobos went to the window and reached his arm inside the apartment. He snaked his arm behind the TV and did something with the doorknob from the inside.[3] He then joined the officers on the grass behind Perez' apartment. (ROA.599:01:51:39 – 01:52:32). Indeed, at all relevant times, there was always an easy and safe retreat, and the SAPD officers were easily getting over the back patio railing to get on and off the patio. (ROA.505).

For approximately the next ten minutes, the Officer Defendants discussed what they should do with other SAPD officers. (ROA.502; ROA.506). There was no

---

[3] As detailed below, he apparently did not unlock the door, but it is also possible that he did unlock the door, but that Perez relocked it immediately thereafter. In any event, the Officer Defendants knew that the door was locked before they opened fire because they had physically twisted the doorknob and had confirmed that the door was locked before they fired the fatal shots.

17

pressing need to go into the apartment at all. (ROA.506-507). Nobody except Perez was visible in the room, and Perez was clearly experiencing delusions from her schizophrenic episode. (ROA.507). Yet, the officers decided that they were going to go into the apartment and subdue Perez – probably as punishment for throwing a candle at an officer. During this discussion, the officers agreed amongst themselves that there was no need to use lethal force, and they identified a sergeant who had a bean bag shotgun. (ROA.506). All of them had tasers. (*Id*.) There was also an officer on site with a large police shield. (ROA.597:01:56:32). During this discussion, the officers confirmed that Perez was wielding a hammer, but stated that they were "not worried about the hammer". (ROA.506; ROA.597:01:56:24 – 01:57:07). The officers decided that if they went into the apartment, they would be able to subdue Perez without significant force, and at the worst, they might have to use a taser. They expressed confidence they could apprehend Perez by using nonlethal force. (ROA.597:01:56:26 – 01:57:16). The officers also had a discussion about a bedridden person being in the apartment. After the shooting, the BWC footage reveals that Perez had been kind enough to take in a homeless person who was resting in another part of the apartment. However, this person was not in the same

room as Perez during any of the events that transpired and was certainly not being threatened by Perez. (ROA.507).[4]

At 2:02 am, Officer Villalobos and Defendant Flores hopped over the railing and went to the back patio door. (ROA.502; ROA.598:02:02:00 – 02:02:06). Defendant Alejandro remained on the other side of the patio railing with his gun aimed at the back patio door. (ROA.502). With Defendant Flores right next to him, Officer Villalobos twisted the doorknob to the back patio multiple times and confirmed that the door was locked.[5] (*Id.*; ROA.598:02:02:04). Defendants Flores and Alejandro saw him do this and knew that the back door was locked. (ROA.502). Perez then started moving towards the back door from inside her apartment with a hammer in her hand shouting "Hey Hey". (ROA.598:02:02:06 – 02:02:09). Inexplicably and contrary to their plan, Defendant Alejandro opened fire and shot several rounds into the apartment towards Perez. Remarkably, all the shots missed, and Perez backed away from the door. (ROA.503; ROA.598:02:02:05 – 02:02:10).

A short time later, Officer Villalobos grabbed the doorknob again and confirmed (again) that he could not open the door because it was still locked.

---

[4] If anyone was a threat to this gentleman, it was the Officer Defendants, who were shooting wildly through the wall and door from multiple directions so that bystander in another room could have easily been hit.

[5] The Complaint alleges that Defendant Alejandro checked the door, but with benefit of the BWC, we know that Defendant Alejandro was behind the patio railing and that it was Officer Villalobos and Defendant Flores who jumped the railing and approached the back patio door.

(ROA.598:02:02:12). Again, Defendants Flores and Alejandro saw this and knew that the door was still locked.  (ROA.597:02:02:13; ROA.598:02:02:13). Shortly thereafter, Perez again moved towards the door with a hammer in her hand.  She did not attempt to unlock the door and did not even reach for the door. (ROA.503-504; ROA.597:02:02:11).  Nevertheless, the trigger-happy Defendant Alejandro opened fire, and Defendant Flores and Officer Villalobos followed by discharging their weapons through the locked door and wall of Perez' apartment. (ROA.503; ROA.598:02:02:12). Bullets from the Officer Defendants struck and killed Perez. Shots from both Officer Defendants' weapons were independently fatal. (ROA.504).

After the Officer Defendants killed Perez, Officer Villalobos started kicking the locked back patio door and, when the shattered glass in the windowpane fell to the ground, he reached his arm through the windowpane and unlocked the door. (ROA.599:02:02:21 – 02:02:33).  Then, he pulled his arm back through the broken glass, twisted the doorknob that he had just unlocked, walked inside, and the officers handcuffed Perez even though her body was completely limp and she was already unconscious or dead.  (ROA.598:02:02:19 – 02:03:06).

After SAPD Police Chief McManus, the City's Mayor and various members of the City Council had reviewed the BWC footage that the Court now has, they publicly condemned the shooting as disturbing, unreasonable, excessive, unnecessary, and avoidable. (ROA.511). Chief McMannus conducted a press release

explaining that Perez had not presented a threat that would justify using lethal force and that the Officer Defendants were to be arrested for murder. (ROA.510-511). He also stated publicly that the shooting officers did not follow established police training and policy regarding the use of deadly force. (ROA.510-511). Later, after reviewing all the evidence, a Bexar County grand jury returned an indictment for murder against the Officer Defendants. (ROA.511).[6]

## SUMMARY OF THE ARGUMENT

Plaintiffs have plausibly alleged a constitutional violation when the Officer Defendants shot and killed Perez while she was in her apartment behind a door that they knew was locked. The following factual allegations support a constitutional violation:

1. Prior to firing the fatal shots, the Officer Defendants saw a fellow officer test the door twice, and they could see that it was clearly locked. Thus, they knew that Perez could not easily leave the apartment without unlocking the door, which she never attempted to do.

2. Nobody else was in the room with Perez, and she was not threatening anyone else who was in her apartment.

---

[6] After the Court granted the Rule 12(b)(6) motion, the criminal case went to trial, and the jury returned a not guilty verdict. Of course, that verdict did not decide whether the officers committed a Constitutional violation – only that the State had not proven murder beyond a reasonable doubt.

21

3. There was no pressing need to go into Perez' apartment. They could have waited or gone home and allowed the mental health team to diffuse the situation.

4. The Officer Defendants had an easy retreat if Perez had attempted to unlock the door. Moreover, they had non-lethal weapons they could have used if needed. Additionally, there was a platoon of officers on scene who could have easily subdued the diminutive Perez if needed.

5. Even though Perez was clearly suffering from a schizophrenic episode, the Officer Defendants threatened to shoot Perez, and they agitated her with aggressive language. *Barnes v. Felix* teaches that Courts are to consider the totality of the circumstances rather than the moment of the threat, and the Officer Defendants should not be allowed to argue that they needed to protect themselves from a situation that they unreasonably created. *See Barnes v. Felix*, 605 U.S. 73, 145 S. Ct. 1353, 221 L. Ed. 2d 751 (2025).

6. The Officer Defendants did not make a split-second decision. They took time to deliberate, and they decided before they breached the patio that they would not use lethal force even though they knew she was carrying a hammer. Given the lengthy time they had to consider and deliberate, the Officer Defendants are entitled to considerably less difference than an officer who is making a split-second, life-or-death decision.

In concluding that Plaintiffs' Complaint does not properly allege a Constitutional violation, the Court made several factual findings that are inconsistent with Plaintiffs' allegations and with the body worn camera footage. These factual findings by the Court include, that the Officer Defendants thought that Perez' door was unlocked, that the Officer Defendants had no safe retreat, that the hammer could have gotten through the windowpanes, and that the Officer Defendants had no way to keep Perez' door closed other than to expose themselves to a hammer strike. All of these assumptions/factual findings by the Court are inconsistent with the factual allegations in Plaintiffs' Complaint. Moreover, the BWC footage supports Plaintiff's allegations. Since we are at the pleadings stage of the litigation, the Court should have accepted all of Plaintiffs' allegations as true unless they are blatantly contradicted by the BWC footage, and in this case, the BWC supports Plaintiffs' allegations.

Turning to the "clearly established law" prong, Plaintiffs submit that this element is satisfied for the following reasons:

1. This is a "clear" or "obvious" case. Certainly, SAPD's police chief thought the violation was clear and obvious, which is why he immediately disciplined the Officer Defendants and referred the case to the district attorney. Moreover, there are multiple 5th Circuit cases finding an "obvious" violation where the violation was less clear than the facts in the present case.

23

2. Even if this were not considered a "clear" case, there are three rules that allow the Plaintiffs to satisfy the clearly established prong of the test. These are:

    a. <u>Officers cannot shoot a suspect who is "functionally unarmed"</u> – meaning that the suspect has a weapon but cannot use it against the officers. In this case, the barriers between the officers and Perez made her functionally unarmed because she could not physically use the hammer to harm anyone as long as she was behind a locked door. Since Perez was functionally unarmed, the Officer Defendants' actions in killing Perez violated clearly established law.

    b. <u>A police officer may not use lethal force if non-lethal means are available – either by retreat or by the use of non-lethal weapons.</u> (*Crane v. City of Arlington, Texas,* 50 F.4th 453, 464 (5th Cir. 2022)). Since both non-lethal force and retreat were available to the Officer Defendants, their actions in killing Perez violated clearly established law.

    c. <u>Officers cannot shoot a suspect who is too far away to be a danger.</u> Plaintiffs submit that being "too far away" is not measured in feet, but rather, it is measured in whether the circumstances are such that the suspect cannot be a credible threat to the officers. Again, in this case, the barriers between Perez and the officers made her too far

away to be an imminent threat to anyone's life or limb. Since Perez was too far away, the Officer Defendants' actions in killing Perez violated clearly established law.

For all these reasons, Plaintiffs respectfully submit that the Court's Order dismissing the case under Rule 12(b)(6) was error.

## ARGUMENT

### I. Legal Standard and Standard of Review

The Court should review the District Court's ruling on the motion to dismiss *de novo*, "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (internal quotation marks omitted). To survive a motion to dismiss on the pleadings under Rule 12(b)(6), the complaint must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the well-pleaded facts allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In ruling on a 12(b)(6) motion to dismiss, "the Court assumes the truth of 'well-pleaded factual allegations' and 'reasonable inference[s]' therefrom." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 181 (2024) (quoting *Iqbal*, 556 U.S. at 678–79). While the Court normally will not consider any facts that are not in the

pleadings, in this case, the Plaintiffs did not (and do not) object to the Court considering the BWC footage attached by the Officer Defendants to their motion to dismiss. In essence, Plaintiffs have agreed that such BWC footage will be treated as if Plaintiffs had attached it to their Complaint. Where relevant events are captured on video, as they are here, "the video depictions of [the] events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video blatantly contradict[s] those allegations." *Winder v. Gallardo*, 118 F.4th 638, 643 (5th Cir. 2024) (citations omitted) ("The district court 'should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account." *Darden v. City of Fort Worth, Tex*., 880 F.3d 722, 730 (5th Cir. 2018)).

## II. The Trial Court Erred in Finding That Plaintiffs Have Not Sufficiently Alleged a Constitutional Violation.

### A. Legal Framework for Excessive Force Cases

"The Fourth Amendment's right to be free from unreasonable seizures governs excessive-force claims." *Roque v. Harvel*, 993 F.3d 325, 332 (5th Cir. 2021). "To prevail on an excessive force claim, a plaintiff must establish: (1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Harmon v. City of Arlington, Tex.*, 478 F. Supp. 3d 561, 569 (N.D. Tex. 2020), aff'd, 16 F.4th 1159 (5th

Cir. 2021) (quotations and citation omitted). Claims of excessive force are determined by the Fourth Amendment's objective reasonableness standard. *Crane v. City of Arlington, Tex.*, 50 F.4th 453, 463 (5th Cir. 2022) ("The third prong depends on the 'totality of the circumstances.' " *Carter v. Diamond URS Huntsville, LLC*, 175 F. Supp. 3d 711, 735 (S.D. Tex. 2016) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)); *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) ("Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on "the facts and circumstances of each particular case.").

The Supreme Court of the United States has recently clarified that the reasonableness of police force is analyzed under a totality of the circumstances standard rather than the moment-of-threat standard. *Barnes v. Felix,* 605 U.S. 73, 145 S. Ct. 1353, 221 L. Ed. 2d 751 (2025) ("We analyze the reasonableness of the force used under factors drawn from *Graham*, including the severity of the crime at issue, whether the suspect poses a threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "While all factors are relevant, the 'threat-of-harm factor typically predominates the analysis when deadly force has been deployed.'" *Crane*, 50 F.4th at 463 (quoting *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021)) ("The reasonableness is judged from the perspective of a reasonable officer on the scene, and only the facts then knowable

27

to the defendant officers may be considered." *Id*. (citing *White v. Pauly*, 580 U.S. 73, 76–77 (2017)). "The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force." *Barnes v. Felix,* 605 U.S. 73 at p. 81 (2025). "Of course, the situation at the precise time of the shooting will often be what matters most," but "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id*. at p. 80.

### B. The Trial Court Erred in Concluding That Plaintiffs Have Not Alleged a Constitutional Violation.

Citing *Rockwell v. Brown*, 664 F.3d 985, 991–92 (5th Cir. 2011) and *Mace v. City of Palestine*, 333 F.3d 621, 624–25 (5th Cir. 2003), the Trial Court's Order reasoned that there would be no excessive force (1) if Perez had charged the officers with a raised hammer and (2) if she had an unobstructed path to attack the officers. However, the Trial Court's Order correctly noted that, "In neither *Mace* nor *Rockwell*, however, was the suspect shot through any sort of barrier. Thus, the question the Trial Court must confront is whether the glass-paneled door makes any difference." (ROA.750). The Trial Court concluded that the presence of the barriers between Perez and the officers did not alter the analysis. (*Id.*)  Plaintiffs disagree. The fact that there was a locked door that prevented Perez from harming the officers makes all the difference in the world and makes this shooting unconstitutional.

**1. In finding that Plaintiffs have not alleged a Constitutional violation, the Trial Court made factual conclusions that are inconsistent with Plaintiffs' allegations and with the BWC.**

    **a. The Trial Court improperly concluded that the Officer Defendants thought that the door through which they fired the fatal rounds was unlocked.**

Plaintiffs have alleged that the locked door and other barriers (the large TV and the apartment's wall) prevented Perez from reaching anyone outside with the hammer that was in her hand. (ROA.502-503). Plaintiffs further alleged that, since the Officer Defendants knew that the door was locked, they also knew that Perez could not potentially be a threat unless she first unlocked and then attempted to open the door, which never happened. (ROA.503-504). Everyone acknowledges that the back door was actually locked when the Officer Defendants shot and killed Perez. The factual issue is whether the Officer Defendants incorrectly thought that the door was unlocked when they opened fire.

The Trial Court's Order analyzed in detail whether the Officer Defendants believed that Perez' back door was locked when they fired the fatal rounds – implicitly acknowledging that, if the Officer Defendants knew that the door was locked (as the Plaintiffs have alleged), then the Officer Defendants could not have reasonably believed that Perez presented a sufficient threat to justify killing her while she was still in her own apartment. Unfortunately, the Trial Court's Order wrongly concluded that the Officer Defendants *thought* that the door was unlocked.

29

(ROA.750). Thus, the opinion reasons, the Officer Defendants cannot be faulted for killing Perez because they could have reasonably thought that Perez could have opened the door and attacked them with the hammer. Specifically, the Trial Court's Order states:

> It is unclear when Officer Villalobos—who was the only officer to actually grasp the doorknob and attempt to open it—became aware that the glass-paneled patio door was still locked. But this does not affect the Officer Defendant's reasonable belief; ***when Perez charged toward the door with her hammer for the second time, they still reasonably believed that the door was unlocked***, as Officer Villalobos had previously told them."

ROA.750 at Footnote 13 (emphasis added).[7]

This conclusion improperly contradicts Plaintiffs' allegations in the Complaint. At the pleadings stage of the case, the Court must accept Plaintiffs' allegations. Moreover, the conclusion in the Trial Court's Order that the Officer Defendants ***thought*** that the door was locked is inconsistent with the BWC. The BWC shows that Officer Villalobos ***did*** know that the door was locked; the BWC shows him unsuccessfully trying to open the door, and the doorknob would not move despite multiple attempts to twist it. (ROA.598:02:02:03 – 02:02:06;

---

[7] Plaintiffs do not dispute that, before the fatal shots were fired, Officer Villalobos reach into the apartment through the window and fiddled with the inside door handle. Although the door remained locked, he apparently believed that he had unlocked the door. At least, he told the Officer Defendants that the door was unlocked when they were huddled on the back lawn and were discussing what they were going to do. However, as explained above, the story does not end there. Although the Officer Defendants were initially told the door was unlocked, they learned the truth (that the door was clearly locked) before they fired the lethal rounds. They actually saw officer Villalobos test the doorknob on two separate occasions before they opened fire, and his actions confirmed twice that it was locked.

ROA.598:02:02:11 – 02:02:13).  The whole point of his actions was to see if the door was unlocked so he could go into the apartment, but he could not because the door was locked.  (*Id*.)  The Trial Court also wrongly concluded that even if Officer Villalobos knew the door was locked, the Officer Defendants must have believed that the door was *unlocked* when they fired the lethal shots. But the Complaint alleges that that the Officer Defendants actually saw Officer Villalobos try to open the door on two separate occasions, and they knew that the door was locked when they fired the fatal rounds through the door and wall.  (*Id.;* ROA.597:02:02:11 – 02:02:13).  This important allegation certainly is not "blatantly contradicted" by the BWC; the BWC confirms Plaintiffs' allegations in this regard.  After all, the BWC showing Officer Villalobos trying to twist the locked doorknob comes from the Officer Defendants' body camera footage (ROA.598:2:02:03-2:02:14; ROA.597:02:02:12 – 02:02:13) – not from Officer Villalobos' BWC.  This means that the Officer Defendants' cameras were facing Officer Villalobos when he demonstrated (twice) that the door was locked.  Thus, unless the Officer Defendants had their eyes closed when their bodies were facing Officer Villalobos, they would have seen that the door was locked. At a minimum, the body camera footage creates a fact issue on the issue of whether the Officer Defendants knew that the door was locked before they fired the fatal shots.

31

The fact that the Officer Defendants knew that the door was locked is important because the Complaint also alleges that the door had wooden or metal panes that were small enough to prevent the hammer from ever reaching anyone outside as long as the door was closed. Again, the Trial Court engages in unwarranted fact-finding hostile to the Plaintiffs' claim. Specifically, the Trial Court's Order states: "absent deadly force, they [the Officer Defendants] could not have kept Perez out of the enclosed patio area except by holding onto the doorknob and trying to keep the door shut, *which would have exposed them to hammer strikes by Perez through the glass panels*." (ROA.750). Again, this factual finding by the Court is contrary to the allegations in Plaintiffs' Complaint, which alleges:

> "Ms. Perez did have a hammer in her hand, but she could not reach any of the officers on the other side of the locked door. This is because *the locked patio door was constructed with wood or metal windowpanes that were small enough to make it physically impossible for a hammer to get through the door.* Moreover, the diminutive Ms. Perez could not have broken through the back door. Even if she had broken the glass in the door with the hammer, she could not have broken down the windowpanes. Thus, whether the glass on the back door was broken, cracked or completely gone, *the back patio door prevented Ms. Perez from presenting any threat or making any physical contact with anyone outside the apartment unless Ms. Perez had unlocked the door and attempted to come out* – something Ms. Perez never hinted that she would do.

ROA.502-503 at Para. 13 (emphasis added).[8]

---

[8]  If the case is allowed to move forward, Plaintiffs plan to provide expert testimony on this point.

32

Unfortunately, the Trial Court's Order simply ignored these allegations and made the unwarranted factual conclusion about this key issue in direct conflict with the allegations in Plaintiffs' Complaint.

### b. The Trial Court wrongly concluded that the officers could not keep the door closed without holding onto the door knob and thus exposing themselves to a hammer strike.

Having wrongly assumed that the Officer Defendants thought the door was unlocked, the Trial Court went on to conclude that that, without holding onto the door (or using deadly force), the Officer Defendants "could not have kept Perez out of the enclosed patio area." (ROA.750). This conclusion is wrong for several reasons. First, as explained above, the panes were small enough to prevent a swinging hammer from getting through. The Trial Court should not have ignored this allegation. The Trial Court also ignored the fact that the BWC shows that Officer Villalobos had previously placed his foot on the door to keep it closed. (ROA.598:01:32:16 – 01:32:31). The officers certainly could have prevented the door from opening without holding onto the doorknob by placing their foot on the door as they previously had done. Of course, the officers did not need to brace their foot on the door because Perez never attempted to unlock the door. (ROA.504).

**c. The Trial Court made an unwarranted factual conclusion that the Officer Defendants could not have safely retreated.**

The Complaint contains several factual allegations establishing that the Officer Defendants could have easily retreated if they had needed to do so. For example, the Complaint alleges:

> Between the time the Officer Defendants arrived on the scene until the time they killed Ms. Perez, the Officer Defendants had easy access to a complete and safe retreat. They never went inside the apartment until after Ms. Perez had been fatally shot. Thus, they were never enclosed by a room or hallway. Moreover, the patio fence was only waist-high, and the Officer Defendants could easily climb or jump over it to get to a safe area in the event that Ms. Perez exited her apartment and threatened the officers, which she did not. Indeed, the SAPD officers on the patio climbed over the fence to get there, and they could have easily done the same thing to retreat if they had wanted to do so.

ROA.505 at Para. 18.

These allegations were ignored in the Trial Court's Order, which states: "It was also reasonable to believe that retreat was not an alternative, because the officers might not have been able to extricate themselves safely from the "relatively confined space" of the patio without being exposed to hammer attacks from behind by a charging Perez." (ROA.750). This simply is not supported by the BWC. The officers easily hopped over the railing and could have done so again if they had needed to do so. (ROA.505; ROA.598:01:52:30 – 01:52:33). Moreover, the Trial Court's Order also ignores that Defendant Alejandro was not even on the patio when he fired the fatal shot – he was on the other side of the patio rail. (ROA.505;

34

ROA.598:02:02:07 – 02:02:16).  Thus, he could have both retreated and provided cover for the officers if such cover were ever needed.

### d. The Trial Court's Order assumes that Perez charged at the officers.

The Trial Court's Order states that "[r]easonable officers in the shoes of the Officer Defendants *would have believed that Perez was charging at them* through an unlocked door."  (ROA.750, emphasis added).  Of course, the BWC shows that Perez was moving towards the locked door with a raised hammer, but this does not mean that she was rushing *at the officers*.  She was not trying to reach the officers or attempting to attack them.  The Complaint addresses her actions as follows:

> Ms. Perez never rushed at the officers on the night she was shot, but she was moving around her apartment. Ms. Perez' movements immediately prior to being shot were not appreciably different from the constant, nervous movements she had been making for more than two hours prior to being shot. Ms. Perez never made any attempt to unlock the door or even reach for the door, which made it impossible for her to swing or throw the hammer in a way that could potentially harm anyone.  Thus, no reasonable officer could have thought that Ms. Perez was going to leave her apartment or attack the Officer Defendants immediately before the Officer Defendants killed her.

> Prior to being shot, Ms. Perez had done everything she could think of to separate herself from the Officer Defendants.  She ran away from them, she locked the front and back door, she barricaded her front door with furniture, she refused to come out of the apartment when they told her to do so, and she yelled at them: "You aint got no warrant" – meaning that she wanted them to go away.  She never attempted to put herself in physical proximity with the Officer Defendants.  Rather, she was afraid and was trying to separate herself from them. Given how hard she was trying to stay away from the officers, the Officer Defendants could not have reasonably thought that she was trying to initiate contact with them or attack them.

ROA.504-505 at Para. 16-17.

In order for the Trial Court to disregard these allegations, the BWC footage would have to blatantly contradict them such that no jury could believe Plaintiffs' version of the facts. In this case, Plaintiffs submit that the totality of the circumstances leads to no conclusion other than Perez was trying to stay away from the officers. There is certainly nothing in the BWC footage that would suggest that Perez was trying to open the door or reach anyone outside the apartment, which is what would have needed to happen if she were to present any threat to those outside.

### e. The Trial Court's Order was incorrect in stating that the Officer Defendants had a reasonable basis for believing that entry into the apartment was urgent.

The Trial Court's Order states that the Officer Defendants "had a reasonable basis for believing that entry was urgent, given the combination of Perez's violent and erratic behavior with the presence of a bedridden old man in the apartment with her." (*See* ROA.754). Perez was not in the "presence of a bedridden old man." The Complaint alleges that she was never in the same room as the man, and she never threatened him in any manner. No reasonable officer could have thought that they needed to urgently enter the apartment and, if necessary, kill Perez because there was potentially an unseen homeless person in another part of the apartment that Perez had kindly taken in and was caring for. Indeed, Plaintiffs' allegations on this point also contradict the notion that the Officer Defendants were making a split-

36

second decision. The officers were on the scene for several hours and the Officer Defendants were there for enough time to go on the back porch, go back to the lawn, huddle up with the platoon of other officers, discuss options, test the door, and then start shooting. There was no need to urgently do anything that night. (ROA.501). Moreover, the Complaint alleges that the officers created the hostile confrontation by unnecessarily escalating the situation. Thus, they cannot complain about being second-guessed. This was not a split-second decision. They had time to deliberate and determine what to do. They just didn't follow their plan, and they now want the Court to excuse their actions as a split-second decision. No! These officers could have and should have been patient.

## 2. The Trial Court's Order Did Not Fully Evaluate the Totality of the Circumstances.

The Trial Court's Order acknowledged the recent Supreme Court case of *Barnes v. Felix*, 605 U.S. 73, 80 (2025), which instructs lower courts to evaluate the context of the shooting by looking at the totality of the circumstances, including the Officer Defendants' conduct. However, the Trial Court's Order did not properly consider the totality of the circumstances. For example, throughout the opinion, the Trial Court's Order assumes that Perez was the aggressor, but the totality of the circumstances shows the opposite. Plaintiffs' Complaint is replete with allegations establishing that the Officer Defendants escalated this event unnecessarily and that Perez was only responding to the officer's aggressive conduct.

37

The Trial Court's Order also failed to mention several important facts alleged in the Complaint including that there was a platoon of San Antonio police officers outside armed with various lethal and intermediate weapons, that Perez was diminutive in size, and that one of the Officer Defendants could be heard on body camera footage saying that he was not worried about the hammer. (ROA.506). If Perez had reached for the door and then attempted to unlock it (which never happened), the platoon of officers could have easily subdued Perez. Thus, considering the totality of the circumstances, Plaintiffs' allegations are sufficient to allow a jury to conclude that no reasonable officer would have believed that lethal force was necessary to eliminate an imminent threat to life or serious bodily injury.

When looking at the totality of the circumstances as properly alleged in the Complaint and as confirmed by the BWC, the Court should conclude that the Officer Defendants had time to safely extricate themselves from the situation through retreat and that they had extra time to consider and pursue other, nonlethal means of incapacitating Perez. Plaintiffs' allegations also demonstrate that there was no pressing need to incapacitate Perez immediately because there was nobody else in the room and because she was separated from the Officer Defendants and other officers by physical barriers. Thus, the Trial Court should have concluded that a reasonable officer in the Defendant Officers' shoes would not have believed that Perez posed an immediate threat of serious physical harm when they shot her. The

38

decision to eschew lesser responses and immediately incapacitate Perez by shooting her through the protective barriers was, therefore, an excessive use of force. Thus, this Court should reverse on the issue of whether the Defendants are entitled to qualified immunity on grounds of whether Plaintiffs have alleged a plausible Constitutional violation.

## III. The Officer Defendants' Actions Violated Clearly Established Law.

Regarding the second prong, Plaintiffs respectfully submit that the allegations in the Complaint, which are confirmed by the BWC footage, establish that clearly established law would have put the Officer Defendants on notice that shooting Perez under these circumstances was clearly excessive. We start by evaluating the law or rule that was clearly established before the shooting, and then we compare the Officer Defendants' actions against such rule.

### A. The Rule Articulated in *Graham* and *Garner* is Sufficient Because This is a "Clear" or "Obvious" Case.

The "general" rule articulated in *Graham* and *Garner* is that a police officer may not use lethal force unless he has probable cause to believe that a suspect presents an imminent threat to life or serious bodily injury. In Paragraph 25 (ROA.508-510), the Complaint alleges that, under the facts of this case, there was no eminent threat to anyone, and that the shooting of Perez was a clear or obvious violation of the test articulated in *Graham* and *Garner*. Paragraph 25 (*Id.*) of the

Complaint cited *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021); *Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 413 (5th Cir. 2009); *Reyes v. Bridgwater*, 362 F. App'x 403, 405-07 (5th Cir. 2010); *Crane v. City of Arlington, Texas*, 50 F.4th 453 (5th Cir. 2022); *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015); and *Cole v. Carson*, 935 F.3d 444 (5th Cir. en banc 2019), all of which were held to be "obvious" or "clear" cases.

The Trial Court's Opinion did not agree that this is a clear case, and it attempted to distinguish *Crane v. City of Arlington* by suggesting that the facts in that case were far more egregious than the facts in the present case. Plaintiffs disagree.  Indeed, each of these cases cited in Paragraph 25 (ROA.508-510.) of the Complaint had facts that were significantly less "clear" than the facts alleged by Plaintiffs in the present case. For example, *Crane v. Arlington*, the Officer Defendants thought that the victim had a weapon and that the vehicle could be used to injure or kill an officer.  Yet, the Court found this to be a clear case.  Likewise, in *Cole v. Carson*, the suspect was mentally ill and had threatened to shoot anyone who tried to take his gun away from him.  Moreover, there was a dispute about whether the suspect was pointing the gun at the police.  Still, the 5th Circuit, sitting *en banc*, determined that shooting the victim involved a "clear" or "obvious" violation which

40

did not require any "clearly established" law other than the test articulated in

*Garner*.[9]

The Honorable Judge Cardone has explained when a case is to be considered

"clear" for purposes of meeting the "clearly established" prong as follows:

> Where the alleged constitutional violation is not the result of split-second decision-making, the rationale of requiring the law to "be so clearly established that—in the blink of an eye, in the middle of a high-speed chase— every reasonable officer would know it immediately" does not apply. *See Morrow*, 917 F.3d at 876. Indeed, one articulation of the qualified immunity standard is that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Cole v. Carson*, 935 F.3d 444, 461–62 (5th Cir. 2019) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). An official with a protracted opportunity to deliberate is more likely to be held accountable for his conduct, because in the course of deliberation, he could more readily come to understand that what he was doing violated the plaintiff's constitutional rights. See *Morrow*, 917 F.3d at 876.
>
> Furthermore, where the constitutional question is sufficiently obvious, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Alexander v. City of Round Rock*, 854 F.3d 298, 305 (5th Cir. 2017) (quoting *Hope*, 536 U.S. at 741, 122 S.Ct. 2508); *see also Kinney v. Weaver*, 367 F.3d 337, 372 (5th Cir. 2004) ("Our cases show that it is entirely appropriate to deny qualified immunity when the balance of cognizable interests weighs so starkly in the plaintiff's favor."). "Although

---

[9] Plaintiffs note that the "clear" or "obvious" doctrine is alive and well with the U.S. Supreme Court. In *Taylor v. Riojas*, 592 U.S. 7 (2020) (per curium), the Supreme Court reversed the Fifth Circuit's finding that certain prison officials were entitled to qualified immunity. The inmate/plaintiff in *Taylor* could not identify a case in which a court held that an inmate confined to extremely unsanitary cells for six days offends the Constitution. But the Supreme Court made clear that he did not have to. It explained that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house Taylor in such deplorably unsanitary conditions for such an extended period of time." *Id.* at p. 8-9. In reaching this conclusion, the Court reasserted its holding in *Hope v. Pelzer*, for the proposition that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Id.*

41

earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope*, 536 U.S. at 741, 122 S.Ct. 2508.

*Pineda v. West Texas Community Supervision*, 2020 WL 466052 * 11, (W.D. Texas, 2020).

Thus, whether a case is "obvious" for purposes of the clearly established prong of the Qualified Immunity defense depends, in part, on how much time the officers had to think about what they wanted to do. In this case, the Officer Defendants had ample time to plan and, in fact, did plan on what they wanted to do, including what they were going to do if Perez threatened them with the hammer. If they would have followed their plan, then she would have been subdued by non-lethal means and there would be no case. Unfortunately, they didn't follow their plan for reasons that have never been explained, and their actions constitute a clear case of a Constitutional violation as defined by the authorities cited above.

Plaintiffs submit that the following allegations make the present case "clear" or "obvious" for purposes of the "clearly established" prong:

1. The Plaintiffs alleged that there was no pressing need to incapacitate Perez immediately. (ROA.507). Indeed, Perez was functionally incapable of using the hammer as a weapon as long as she was behind the locked door. (ROA.509).

2. The Plaintiffs alleged that the Officer Defendants were not engaged in split-second decision making. (ROA.507-508). The Officer Defendants were

42

some of the last officers on the scene, and they had ample time to back off and deliberate. (ROA.510).   Indeed, they did deliberate and decided that lethal force was not necessary.

3. The Plaintiffs alleged that the Officer Defendants didn't need to escalate the situation at all, and they could have (and should have) proceeded patiently. (ROA.501).

4. The Plaintiffs alleged that the Officer Defendants had easy access to a path of retreat.  (ROA.503; ROA.505-506).

5. Plaintiffs alleged that there were at least six (6) SAPD officers behind the back patio and that Perez was diminutive in stature, which further reduced any thought that she might present a threat to them.  (ROA.501-502).

6. Plaintiffs alleged that SAPD Chief McMannus investigated the shooting and then publicly announced the results of such investigation, including that (1) the use of deadly force was not reasonable and (2) that the Officer Defendants violated SAPD policy and training when they shot Perez.  Chief McManus then had his own officers arrested for shooting Perez.  (ROA.510-511).

7. Several San Antonio City policy makers, including the mayor and several city council members, reviewed the evidence and publicly announced that the shooting was "very disturbing, unreasonable, excessive, unnecessary and avoidable." (*Id*.)

**B. Assuming, *Arguendo*, That a Rule More Specific Than the Rule in *Graham* and *Garner* is Needed, Plaintiffs Have Alleged Three Rules of Law That Would Have Placed the Officer Defendants on Notice That Their Actions Violated Clearly Established Law.**

Paragraphs 25-26 (ROA.508-510.) of the Complaint articulate three rules that allow Plaintiffs to meet their burden of showing that the Officer Defendants' decision to shoot Perez violated clearly established law.

Rule #1 – A police officer may not Constitutionally shoot a suspect who is "functionally unarmed", (citing *Roque v. Harvel* and *Mason v. Lafayette).*

*Roque v. Harvel*, 993 F.3d 325, 335 (5th Cir. 2021), states that "where a suspect has a weapon but is incapacitated or ***otherwise incapable of using it*** (functionally unarmed)" then shooting the suspect is unconstitutional. *Id*. (emphasis added), citing *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015) ("Shooting a clearly incapacitated suspect is inconsistent with *Garner's* command that deadly force is unconstitutional when a 'suspect poses no immediate threat to the officer and no threat to others.'"). The rule is also articulated in *Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 413 (5th Cir. 2009), which held that, when a suspect fleeing in a car had ceased to pose an immediate danger because the car had gone several houses down the road, deadly force was not justified.

The Trial Court's Order states that the "functionally unarmed" rule articulated in *Roque* is not applicable because "Perez cannot be described as 'functional armed'; she was running toward Sergeant Flores and Officer Villalobos with a hammer."

44

(ROA.753). This statement captures one of the primary concerns Plaintiffs have with the Trial Court's Order because it ignores the allegation that door was locked and that the Officer Defendants knew it was locked. Thus, Perez was "functionally unarmed" because the physical barriers between her and those outside the apartment prevented her from using the hammer to harm the officers. Plaintiffs note that the particular weapon does not matter for purposes of crafting a rule that governs the case. Rather, the issue is whether the rule is clear enough to provide notice to the Officer Defendants of the unconstitutionality of their actions. In this case, the "functionally unarmed" rule provided ample notice because the barriers between Perez and the SAPD officers physically prevented her from being a threat.

> Rule #2 – A police officer may not use lethal force if non-lethal means are available – either by retreat or by the use of non-lethal weapons, citing *Crane v. City of Arlington, Texas.*

*Crane* teaches that police officers may not Constitutionally "eschew lesser responses" that are clearly available to them. In this case, the Officer Defendants had tasers. One officer on the scene had a bean bag shotgun and another had a police shield. (ROA.506; ROA.597:01:56:32). Moreover, the Officer Defendants had an easy retreat in the event that Perez had opened the patio door and attempted to make contact with them. (ROA.510). Because Perez never attempted to open the door or get past the barriers separating her from the Officer Defendants, there was never a need to use the non-lethal weapons, but if Perez had done so, then *Crane* made it

45

clear that the Officer Defendants could not shoot Perez until after such non-lethal means were first attempted. This is particularly true when, as in this case, the Officer Defendants had ample time to deliberate and consider non-lethal options when they had a full complement of officers in the immediate vicinity to help if necessary.

> Rule #3 – A police officer may not shoot a suspect who is too far away to be an imminent threat, citing *Lytle v. Bexar Cnty., Tex.,* 560 F.3d 404 (5th Cir. 2009)*; Reyes v. Bridgwater*; *Bacque v. Leger*, 207 F. App'x 374, 376 (5th Cir. 2006); *Amador v. Vasquez*, 961 F.3d 721, 730 (5th Cir. 2020)).

These cases all make it clear that a suspect who is not in immediate proximity to the officers cannot pose an imminent threat. Therefore, the Constitution prohibits the use of lethal force in these circumstances. In this case, Perez was not close enough to the Officer Defendants to create an imminent threat because there were barriers between them. The Trial Court's Order attempts to distinguish this rule by pointing out that Perez was closer to the Officer Defendants than the victims in the cases cited above. However, the legal doctrine is not rooted in the number of feet between the officers and the victim, but whether the distance eliminated any reasonable apprehension of death or serious bodily injury. In this case, the barriers eliminated any such reasonable fear of harm. Therefore, following the rule articulated in these four cases, the law was clearly established that lethal force was prohibited by the Constitution.

Plaintiffs allege that any one of these rules articulated above are, by themselves, sufficient to satisfy the "clearly established" test for purposes of

46

defeating the Officer Defendants' qualified immunity defense. Collectively, these rules make the case against qualified immunity even stronger.

### C. The City's Prior Training and The Response By San Antonio Policy Makers Demonstrate That the Law Prohibiting the Use of Lethal Force in This Case Was Clearly Established at the Time the Shooting Occurred.

The results of a post-incident investigation conducted by San Antonio City policy makers are important *facts* (not mere legal conclusions), and these facts are especially relevant to whether the Officer Defendants were on notice that their conduct was unconstitutional.  In this regard, Chief McMannus' statement that the Officer Defendants' conduct violated both the City's policy and the relevant police training is significant.  SAPD's policies were developed after considering the clearly established law applicable to the use of deadly force.  The same is true for SAPD's training.  Thus, the factual allegations establishing that, according to Chief McMannus, the City had policies and training materials that prohibited the Officer Defendants' conduct is further evidence that "clearly established" law prohibited the Officer Defendants from shooting Perez.

Plaintiffs note that SAPD's policies and training regarding the use of deadly force are important ways to identify "clearly established" law.  As Judge Hendrix has noted, "caselaw is not the only source of clearly established law." *Brooks v. Taylor County*, 2021 WL 4458380, *8, (N.D. Texas, Abilene Div., Sept.,29, 2021) (finding that regulations governing the operation of detention facilities were relevant

when deciding whether a right was clearly established and concluding that to the extent the defendants conduct deviated from these standards, a reasonable jury could conclude that the defendants violated law that was clearly established at the time.).

In *Hope v. Pelzer*, the U.S. Supreme Court expressly considered policies from the Alabama Department of Corrections when analyzing whether the defendants violated "clearly established" law when they affixed the plaintiff to a "hitching post" without sufficient breaks or water. The Supreme Court found that "in light of ... a DOJ report informing the [defendant] of the constitutional infirmity in [the alleged misconduct], we readily conclude that the respondents' conduct violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'") *Hope v. Pelzer*, 536 U.S. 730 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Likewise, the U.S. Supreme Court relied on ATF guidelines in addition to case law to conclude that relying on an invalid search warrant violated "clearly established" law. *Groh v. Ramirez*, 540 U.S. 551, 565 (2004).

Additionally, after the Supreme Court issued the *Hope* and *Groh* opinions, the 5th Circuit and several district courts within the 5th Circuit have relied on a variety of sources beyond binding case authority when evaluating whether the law was "clearly established" at the time of the alleged constitutional violation. For example, in *Valigura v. Mendoza*, 2006 WL 4072061 * 10 (S.D. Texas, Oct. 30, 2006), the

court considered both the Texas Department of Criminal Justice lockdown policy and the Offender Handbook when determining that "clearly established" law prohibited the 8th Amendment violations alleged in that case.[10] Additionally, in *Hart v. Texas Dept. of Criminal Justice*, 106 Fed.Appx. 244 (5th Cir. 2004), the 5th Circuit considered summary judgment evidence that the defendant doctor had been repeatedly warned by another doctor that the inmate transfer referral system placed the inmates in serious danger. The Court found that this evidence was important in establishing that "clearly established" law prevented the alleged medical neglect at issue in the case. *Id*. at *251. Finally, in *Oliver v. Arnold*, 19 F.4th 843 (2021), the Fifth Circuit denied *en banc* review of an opinion denying qualified immunity in a First Amendment case. After referencing the U.S. Supreme Court's reliance on DOJ guidelines in *Hope*, the Honorable Judge Dennis explained in considerable detail how the applicable guidelines and training materials helped establish that the defendant "received ample warning that forcing [the plaintiff] to embrace the Pledge over her personal, political, and religious objections would violate her constitutional rights." *Id.* at 851.

---

[10] The opinion was written by U.S. Magistrate Judge Ellington. Her report and recommendation was adopted by the District Court with modifications that are not applicable to the issue in this case. (See, *Valigura v. Mendoza*, 2007 WL 547757, (S.D.Texas, Corpus Christi, Feb. 15, 2007). The opinion was then affirmed by the 5th Circuit. (*Valigura v. Mendoza*, 265 Fed.Appx. 232 (5th Cir. 2008).

Plaintiffs acknowledge that there has been some ambiguity, both from the Supreme Court and within the 5th Circuit, about the potential sources that may be considered when evaluating whether an officer violated "clearly established" law. For example, in *Davis v. Scherer,* the Supreme Court considered a wrongful termination case and refused to consider the violations of the county's internal policies when determining whether a violation of the 14th Amendment had occurred. *Davis v. Scherer*, 468 U.S. 183 (1984).  However, *Hope v. Pelzer* and the other cases cited above were decided after *Davis*, and they represent the better policy.  After all, the dispositive issue is whether the Officer Defendants had reasonable notice that their conduct was unlawful.  Thus, the City of San Antonio's applicable policies and training materials should be highly relevant in determining whether the Officer Defendants were on notice that killing Perez was unlawful. When Chief McManus said that "the shooting officers' actions were not consistent with SAPD's policy and training," his point was that the Officer Defendants should have known that they were not supposed to shoot Perez under these circumstances. That is why punishing the Officer Defendants was justified. The fact that the City had such training and the fact that Chief McManus stated that the Officer Defendants violated such training are important allegations establishing that "clearly established" law placed them on notice that they should not have used deadly force against Perez.

Additionally, the allegations establishing the swift and unequivocal condemnation of the shooting by Mayor Nirenberg and members of the City Council, all help Plaintiffs meet their burden of showing that any competent and reasonable officer would have been on notice that shooting Perez under these circumstances violated "clearly established" law. If it was clear to them, it should have been clear to the Officer Defendants.

## IV.    The Case Against the City of San Antonio, Texas Should Not be Dismissed.

The Trial Court's Order reasoned that, since the Court had found no constitutional violation, the *Monell* case against the City would also be dismissed. (ROA.755-756). Plaintiffs agree that, if they had not properly alleged a Constitutional violation, then the case against the City should be dismissed without getting into whether the Complaint properly alleged that the violation was caused by a formal or informal policy by the City. However, in this case, Plaintiffs submit that they have alleged a proper Constitutional violation, and the Trial Court's Order on that issue is incorrect. Thus, the Trial Court's Order dismissing the City's case is also incorrect and the *Monell* case against the City should be reinstated for further discovery on the merits of the case.

## CONCLUSION

In support of its Order granting Defendants' Motion to dismiss, the Trial Court used a version of the facts that are substantially different than the facts alleged by

Plaintiffs. The only way that could be proper is if the BWC footage blatantly contradicts Plaintiffs' allegations such that no reasonable jury could believe Plaintiffs version of the facts. However, when the police chief, the mayor, the city council and the Plaintiffs saw the same BWC footage that the Trial Court saw, all of them concluded that the Officer Defendants were not in imminent danger and that the shooting was unreasonable. Apparently, the Court interpreted the BWC differently, but the fact remains that reasonable people can see the BWC footage and agree with Plaintiffs' version of the facts. Indeed, high ranking City officials who typically side with the police, agree with Plaintiffs' version of the facts. Certainly, a jury could do so as well. Thus, the Trial Court should not have disregarded Plaintiffs' allegations on key issues such as whether the Officer Defendants knew that the door was locked, whether the door prevented the hammer from reaching those outside, whether non-lethal measures could have been attempted, and whether it would have been reasonable for the Officer Defendants to be patient. If the Trial Court had accepted Plaintiffs' factual allegations articulated in the Complaint, then the Motion would have been denied. Plaintiffs respectfully request that the Court accept all of Plaintiffs' factual allegations and reverse the Trial Court's Order by holding (1) that the Plaintiffs' Complaint sufficiently alleges a constitutional violation for excessive force and (2) that the Officer Defendants' conduct violated clearly established law.

Respectfully submitted,

THE PACKARD LAW FIRM


By: s/Daniel William Packard_____
    Daniel W. Packard
    State Bar No. 00791392
    Email: dan@packardfirm.com
    1100 NW Loop 410, Suite 104
    San Antonio, Texas 78213
    Telephone Number: (210) 340-8877
    Fax Number: (210) 340-8787

    Attorney for Plaintiffs/Appellants

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing instrument has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on January 14, 2026, on all registered counsel of record, and has been transmitted to the Clerk of the Court.


s/Daniel William Packard
Daniel W. Packard, Attorney of record for Appellants/Plaintiffs

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed.R.App. R. 32(A)(7)B) because this brief contains 11,437 words, as measured by the word counter in Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(A)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 365 Document in 14-point Times New Roman font.

Dated:       January 14, 2026


s/Daniel William Packard_____
Daniel W. Packard, Attorney of record for Appellants