## No. 25-50886

---

### IN THE
### UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

---

Alexis Tovar, Individually and as Next Friend of D.P., a Minor;
Phillip Reyes, as Next Friend of A.R. and J.R., Minors,

*Plaintiffs – Appellants*

v.

City of San Antonio; Eleazar Alejandro, San Antonio Police Officer;
Alfred Flores, San Antonio Police Officer

*Defendants – Appellees*

---

On Appeal from United States District Court
for the Western District of Texas
No. 5:23-cv-00847-FB
Hon. Samuel Fred Biery Jr., District Judge

---

### BRIEF OF APPELLEES
### ALFRED FLORES & ELEAZAR ALEJANDRO

---

**Stephen B. Barron**
State Bar No. 24109619
sbarron@w-g.com
**WRIGHT & GREENHILL, P.C.**
4700 Mueller Boulevard, Suite 200
Austin, Texas 78723
512-476-4600
512-476-5382 – Fax

**Blair J. Leake**
State Bar No. 24081630
bleake@w-g.com
**WRIGHT & GREENHILL, P.C.**
4700 Mueller Boulevard, Suite 200
Austin, Texas 78723
512-476-4600
512-476-5382 – Fax

*Attorneys for Appellees*
*Alfred Flores and Eleazar Alejandro*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees/Defendants | Trial & Appellate Counsel |
|---|---|
| Alfred Flores<br>Eleazar Alejandro | Stephen B. Barron<br>State Bar No. 24109619<br>sbarron@w-g.com<br>Blair J. Leake<br>State Bar No. 24081630<br>bleake@w-g.com<br>**WRIGHT & GREENHILL, P.C.**<br>4700 Mueller Boulevard, Suite 200<br>Austin, Texas 78723<br>(512) 476-4600<br>(512) 476-5382 – Fax |

| Appellant/Plaintiff | Trial & Appellate Counsel |
|---|---|
| Alexis Tovar<br>D.P, a Minor<br><br>Phillip Reyes<br>A.R and J.R., Minors. | Dan W. Packard<br>Dan@packardfirm.com<br>**THE PACKARD LAW FIRM**<br>1100 NW Loop 410, Suite 100<br>San Antonio, Texas 78213<br>(210) 340-8877<br>(210) 340-8787 – Fax |

ii

| Appellee/Defendant | Trial & Appellate Counsel |
|---|---|
| City of San Antonio, Texas | **Laura Flores Macom**<br>LMacom@langleybanack.com<br>**LANGLEY & BANACK, INC.**<br>Trinity Plaza II<br>745 East Mulberry, Suite 700<br>San Antonio, TX 78212<br><br>**Elizabeth Guerrero-Southard**<br>**Elizabeth.Guerrero-Southard@sanantonio.gov**<br>**City of San Antonio, Litigation Division**<br>203 S. St. Mary's St., 2nd Floor<br>San Antonio, Texas 78205<br>Mailing Address: P.O. Box 839966<br>San Antonio, Texas 78283-3966<br>(210) 207-2108<br>(210) 207-4357 – Fax<br><br>**Mark Kosanovich**<br>**mk@fitzkoslaw.com**<br>**FITZPATRICK & KOSANOVICH, P.C.**<br>P.O. Box 831121<br>San Antonio, Texas 78283-1121<br>(210) 408-6793<br>(210) 408-6797 – Fax |

_/s/ Stephen B. Barron_
Stephen B. Barron
Attorney of Record for Appellees
Alfred Flores and Eleazar Alejandro

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to FED. R. APP. P. 34, Appellees believe that the facts and legal arguments relative to this appeal are adequately presented in the Briefs and the record on appeal. This Court's decisional process of the issues presented would thus not be significantly aided by oral argument.

Appellees accordingly submit that oral argument is unnecessary to the disposition of this appeal and respectfully request that the Court affirm—in all respects—the District Court's order granting Appellees' Motion to Dismiss based on the Briefs and record before it.

Should this Court determine that oral argument is necessary in this case, Appellees respectfully request to participate to respond to Appellant and to any questions from a panel of this Court.

# **TABLE OF CONTENTS**

Certificate of Interested Persons.................................................................. ii

Statement Regarding Oral Argument ................................................... iii

Table of Contents ............................................................................. v

Index of Authorities.......................................................................... vii

Jurisdictional Statement ................................................................... ix

Statement of the Issues Presented ..................................................... 2

Statement of the Case........................................................................ 3

Summary of the Argument ................................................................ 25

Legal Standard ................................................................................ 27

Arguments & Authorities ................................................................. 28

    A. Issue 1: Objectively reasonable officers could believe that deadly force was imminently necessary to stop the erratic and violent Melissa Perez from charging and attacking with a hammer. The district court correctly awarded that these Officers qualified immunity under the first prong of the defense ................................................................28

        a. Tovar's appeal only challenges the district court's findings under the second *Graham* factor. Under the Fourth Amendment's objective reasonableness standard, officers may use deadly force when they have reason to believe that the suspect poses a threat of serious harm to the officer or to others. The assessment of the threat posed by the suspect is a question of law for this Court…………………………………………………...……..28

        b. Under the totality of the circumstances, objectively reasonable officers could view Melissa Perez's reckless charge while raising her hammer as an imminent attack threating serious harm as a matter of law—despite the glass-paneled patio door between Perez and these Officers………………………………………....30

v

      i. Perez's prior conduct was so violent and angry that no reasonable officer could view her charge with the hammer as anything but a violent attack. Appellant's subjective proffer of Perez's intentions are impermissible under the law ....................................................................30

      ii. The district court correctly held that objectively reasonable officers could believe that Perez's attack posed an immediate threat as a matter of law under these facts, despite the glass-paneled patio door and other environmental factors. ...................................................34

   c. Tovar's argument that these Officers subjectively knew that the patio door was locked is meritless as a matter of law under the facts revealed by the clear video evidence ..............................35

B. Response Issue: As a matter of first impression, if an objectively reasonable officer could believe they are the target of an ongoing attack with a deadly weapon, this Court should hold that the Fourth Amendment does not require officers to make granular split-second calculations to determine if the attack will miss or otherwise be rendered ineffective by environmental factors in order for the attack to be deemed an immediate threat. ......................................................38

C. Issue 2: The district court correctly found that these Officers are entitled to qualified immunity on the second prong of the defense. Tovar's proffered "Rules" are untethered from the case law and this is not an obvious case...............................................................................41

a. This is not an obvious case. This Court should accordingly not excuse Tovar from her burden of demonstrating that the law was clearly established by a similar case...........................................................42

b. Plaintiffs' proffered "Rules" are untethered from the case law and the district court below ably distinguished them from these facts............43

Conclusion and Prayer...........................................................................44

Certificate of Compliance .....................................................................45

Certificate of Service .............................................................................45

# INDEX OF AUTHORITIES

**CASES**                                                            **PAGE**

*Anderson v. Estrada*,
140 F.4th 634 (5th Cir. 2025), cert. denied,
No. 25-403, 2025 WL 3260215 (U.S. Nov. 24, 2025)……………………..27

*Argueta v. Jaradi*,
86 F.4th 1084 (5th Cir.2023) ...................................................................30

*Baker v. Coburn*,
68 F.4th 240 (5th Cir. 2023) ...................................................................30

*Bakutis v. Dean*,
129 F.4th 299 (5th Cir. 2025) ..................................................................29

*Barnes v. Felix*,
152 F.4th 669 (5th Cir. 2025) ..................................................................36

*Barnes v. Felix*,
605 U.S. 73, 80 (2025)........................................................................31, 40

*Cloud v. Stone*,
993 F.3d 379 (5th Cir. 2021)....................................................................33

*Favre v. Sharpe*,
117 F.4th 342 (5th Cir. 2024) ..................................................................36

*Graham v. Connor*,
490 U.S. 386 (1989) .......................................................................... *passim*

*Griggs v. Brewer*,
841 F.3d 308 (5th Cir. 2016)....................................................................33

*Harmon v. City of Arlington, Tex.*,
16 F.4th 1159 (5th Cir. 2021) ..................................................................42

*Harris v. Serpas*,
745 F.3d 767, 773 (5th Cir. 2014), abrogated on other grounds by Barnes v.
Felix, 605 U.S. 73 (2025))……………………………………………..37

**CASES (cont'd.)** PAGE

*Kisela v. Hughes*,
    584 U.S. 100 (2018) ...................................................................................42

*Mace v. City of Palestine*,
    333 F.3d 621(5th Cir. 2003)...................................................................30

*Morrow v. Meachum*,
    917 F.3d 870 (5th Cir. 2019)..................................................................42

*Ramirez v. Granado*,
    163 F.4th 204 (5th Cir. 2025) ................................................................34

*Scott v. Harris*,
    550 U.S. 372  (2007).........................................................................28, 32

*Terrell v. Allgrunn*,
    114 F.4th 428 (5th Cir. 2024) ................................................................30

*Tex. Democratic Party v. Abbott*,
    978 F.3d 168, 177 (5th Cir. 2020)..........................................................29

*Tennessee v. Garner*,
    471 U.S. 1, 11 (1985).............................................................................34

*Tolan v. Cotton*,
    572 U.S. 650, 658 (2014).......................................................................34

*Winder v. Gallardo*,
    118 F.4th 638 (5th Cir. 2024)
    *cert. denied,* 145 S. Ct. 2816 (2025) ...................................................30

**STATUTES** PAGE

28 U.S.C.A.
    § 1291 ..................................................................................................... xi

42 U.S.C.A.
    § 1983....................................................................................................18

**RULES**                                                                        **PAGE**

FED. R. APP. P.

28(a)(6) ................................................................................ 18
28(b) ..................................................................................... 18
32(a)(7)(B) ........................................................................... 44
32(a)(5) ................................................................................ 45
32(a)(6) ................................................................................ 45
34 ........................................................................................... x

FED. R. CIV. P.
12(b)(6) ................................................................................ 27

## <u>JURISDICTIONAL STATEMENT</u>

This Court has jurisdiction over this appeal of the District Court's Final Judgment pursuant to 28 U.S.C.A. § 1291 and the District Court's Order Granting Appellees' Motion to Dismiss. **ROA.785**.

## STATEMENT OF ISSUES PRESENTED

**Issue 1**: Did the district court correctly hold that San Antonio Police Officers Alfred Flores and Eleazar Alejandro acted as objectively reasonable officers when they used deadly force to stop the erratic and violent Melissa Perez from charging and attacking them with a hammer—therefore awarding them qualified immunity under the first prong of the defense?

**Issue 2**: Did the district court correctly hold that the law was not clearly established that it was unconstitutional to use deadly force on a suspect that was charging at law enforcement with an upswung hammer when that suspect was on the other side of a thin glass-paneled door next to a completely open window—therefore awarding them qualified immunity under the second prong of the defense?

**Response Issue**: As a matter of first impression, if an objective officer could reasonably believe they are the target of an ongoing attack with a deadly weapon, does *Graham*'s "immediate threat" requirement ask officers to make a split-second calculation to determine if the attack will miss or otherwise be rendered ineffective by environmental factors—such as a glass-paneled door? Or does this confuse the *immediacy* of a deadly threat with that threat's *chance* of success?

## STATEMENT OF THE CASE

2.    Plaintiffs-Appellants (hereinafter "Tovar") conceded in the district court below and in her Appellant's Brief that she does not challenge the district court's consideration of the Body-Worn Camera footage at the 12(b)(6) stage of this litigation.[1] San Antonio Police Officers Alfred Flores and Eleazar Alejandro (hereinafter "Sgt. Flores and Officer Alejandro" and collectively "the Officers" or "these Officers") attached their Body-Worn Cameras to support their Second Motion to Dismiss Tovar's Third Amended Complaint—asserting that Tovar had incorporated these videos by reference into her Third Amended Complaint.

3.    The district court agreed and thus issued its Order after reviewing the Officers' Body-Worn Camera footage.[2] The Order adopted the facts revealed by these videos, and disregarded the facts pled in Plaintiff's Third Amended Complaint when they were clearly contradicted by this evidence.[3] The Officers accordingly recite the factual background of this case as depicted by the undisputed video evidence.[4]

---

[1] Appellants' Br. 14 (stating Appellant "did not object to the [District] Court considering the BWC footage when evaluating the merits of the Motion" to Dismiss.).

[2] Since District Judge Biery accepted the Report & Recommendation of Magistrate Bemporad and adopted it as if it were the Court's own order, Appellees refer to the R&R below as if it were the district court's order.

[3] **ROA.794** (the district court's order determining that this video evidence was ripe for review at the 12(b)(6) stage under this Circuit's precedents and noting in footnote 2 that plaintiffs conceded that it should be reviewed).

[4] Appellees also recite facts revealed by the Body-Worn Camera footage captured by former Defendant Nathaniel Villalobos—as it is relevant to these issues presented on appeal.

3

A. **FACTUAL BACKGROUND.**

   a. **In the early morning hours of June 23, 2023, a callout over police radio reported that a San Antonio officer had just been attacked and struck by a glass candle thrown by Melissa Perez—an act amounting to a felony assault on a peace officer. Former Defendant Officer Villalobos, and Sgt. Flores and Officer Alejandro responded to the scene.**

4.     At 1:41 a.m. on June 23, 2023—Sgt. Flores's Body-Worn Camera ("BWC") reveals that he received a callout over his radio that an officer had a suspect at gun point, and another officer reported via radio that he had just been struck by a glass candle.[5]

5.     Officer Alejandro's BWC reveals that he received the same callout about a suspect being held at gunpoint.[6] Former Defendant Officer Villalobos's BWC reveals that he was also told this by his partner who was listening to the radio while Villalobos was talking with a citizen on another call.[7] All three officers rushed to the scene of the assailant—identified as the decedent Melissa Perez. (hereinafter "Perez"). While in route, these Officers heard over the radio at exactly 1:45:30 a.m.

---

[5] **ROA.597**, *Flores BWC*, **04:00 – 04:11**.
[6] **ROA.598**, *Alejandro BWC*, **06:23 – 06:34**.
[7] **ROA.599**, *Villalobos BWC*, **04:00 – 04:06**.

that the officer who had been struck by the glass had bruising from the assault.[8] Elevating Perez's assault to a felony under Texas law.[9]

### b. Officer Villalobos arrived on scene and tried to engage Perez. The video evidence shows that Villalobos was informed of the situation, and that there was an "old man" inside the apartment with her.

6.     Officer Villalobos arrived on scene before these Appellees. Villalobos and his partner arrived at 1:47:06 a.m.[10] As he walked on scene, Villalobos was told by officers already on scene that officers were originally called to investigate a criminal mischief offense because Perez had cut wires belonging to the apartment complex. Officer Villalobos was further told that officers had already attempted to gain entry into the apartment and that there was an old man inside with Perez.

7.     Villalobos's BWC footage depicts that Perez's window was completely open and the mesh screen that normally covered the window had been taken down. The screen was lying on the ground in the enclosed concrete patio. Officer Villalobos walked up to the metal railing that surrounded that patio and attempted to talk with Perez. Officer Villalobos asked her to come outside and explain was going on

---

[8] **ROA.597**, *Flores BWC*, **07:44**; *see also* **ROA.598**, *Alejandro BWC*, **10:40**; *see also* **ROA.599**, *Villalobos BWC*, **06:59** (this moment reveals that the Axion date and timestamp in the top right corner of these videos is synced to the correct time across all of the footage.).
[9] TEX. PEN. CODE ANN. § 22.01 (b-2) (elevating an assault on a peace officer to a second-degree felony if it causes bodily injury pursuant to subsection (a)(1)).
[10] **ROA.599**, *Villalobos BWC*, **08:35**.

tonight. Perez refused—insisting that the San Antonio officers required a warrant and that they were "disrespecting" her.[11]

8.   The officers already on scene told Officer Villalobos that Perez had committed a felony by striking an officer with a candle, and that the officers had already tried to go through the open window before they were forced to retreat when Perez threw the candle and then armed herself with a hammer.[12] While Officer Villalobos discussed possible solutions with his fellows, Perez continued proffering invective at the officers, telling them they looked "ridiculous."[13]

> **c.  Sgt. Flores arrived on scene at 1:48 a.m. He spoke with the officer who had been struck by the candle. Sgt. Flores stated that Perez had committed a felony assault on a police officer. Sgt. Flores attempted to convince Perez to come outside peacefully, and she refused.**

9.   Sgt. Flores's arrived and walked up to the scene at 1:48 a.m.[14] As he arrived, Sgt. Flores spoke with the officer that Perez had struck with the glass candle. The officer generally stated that he was "ok", but using a flashlight, the officer showed Sgt. Flores that Perez had left a red mark where she "hit [him] with the glass." The injured officer went on to clarify that the object was a glass candle holder and that Perez was now armed with a hammer.[15]

---

[11] *Id*. at **08:40 – 10:20**.
[12] *Id*. at **10:20 – 10:50**.
[13] *Id*. at **10:50 – 11:30.**
[14] **ROA.597**, *Flores BWC*, **10:55**.
[15] *Id*. at **10:40 – 10:50**.

6

10.     The officer told Sgt. Flores that he had tried to go inside the apartment to apprehend Perez for criminal mischief by pushing in the window screen. But—while doing so— Perez "came at [him] with the hammer" forcing him to retreat and pull his service weapon. It was at that time that  Perez threw the candle, striking him in the arm.[16] Sgt. Flores then walked closer to  Perez's patio, and the officer pointed out the broken candle on the ground. Sgt. Flores then exclaimed "we have an assault on a [police officer]."[17]

11.     At 1:50:30 a.m., Sgt. Flores joined Officer Villalobos at the railing of  Perez's patio and introduced himself as a Sergeant with the San Antonio Police.[18] Sgt. Flores explained she had assaulted one of his officers. He asked her to come out of her apartment to avoid making her arrest "more difficult." Perez refused to leave her apartment and claimed it was actually the officers who assaulted her. Sgt. Flores walked away at 1:51:00 a.m. in search of an apartment complex employee.[19]

>     **d. Officer Alejandro arrived at 1:50 a.m. Simultaneously, Officer Villalobos climbed over the railing onto the patio and reached through the open window to unlock  Perez's patio door.**

12.     Officer Alejandro arrived last, and his BWC footage reveals that he walked up on scene at 1:50:55 a.m.—just as Sgt. Flores finished trying to convince  Perez

---

[16] *Id*. at **10:50 – 11:10**.
[17] *Id*. at **11:30 – 12:15**.
[18] *Id*. at **12:20 – 12:45**.
[19] *Id*. at **12:45 – 13:15**.

to leave her apartment voluntarily.[20] Officer Alejandro began speaking with the other officers on scene.

13.    At the same time, Officer Villalobos jumped over the railing[21] at 1:51:40 a.m. Villalobos stuck his head and torso through Perez's open window and he quickly reached all the way over to the back patio door and unlocked it from the inside. An audible "clunk" that sounded like a lock unbolting can be heard.[22]

14.    In a split second, Perez and other officers screamed "hey hey" and Villalobos quickly removed his head from the window. Officer Villalobos asked, "did she have anything on her?" A female officer replied, "yeah she has a hammer, she almost hit you dude."[23]

15.    Officer Alejandro's footage depicts that Perez had run back up to the window, and that a female officer had withdrawn her firearm and had it trained on Perez.[24] Officer Alejandro told "Maria" to hold her position, and Officer Alejandro asked Officer Villalobos if he was "able to jump back" over the railing to get away from Perez.[25]

> e. **Sgt. Flores briefly returned to tell officers to back up as he worked to find an apartment complex employee. Afterwards, Officer Villalobos managed to jump back over the railing to rejoin his fellows at Officer Alejandro's direction. Officer Villalobos then**

---

[20] **ROA.598**, *Alejandro BWC*, **16:00 – 16:05**.
[21] The videos show Officer Villalobos did this twice in quick succession.
[22] **ROA.599**, *Villalobos BWC*, **13:08 – 13:24**.
[23] *Id*. at **13:25 – 13:33**.
[24] **ROA.598**, *Alejandro BWC*, **17:10 – 17:17.**
[25] *Id*. at **17:17 – 17:25**.

**stated that he had succeeded in unlocking the patio door. Other officers told Alejandro that a bedridden man was in the apartment with Perez and Alejandro exclaimed that meant officers "had to make entry."**

16.    At 1:52:20 a.m., Sgt. Flores' returned and asked his officers to away from Perez's patio they waited for him to speak with an apartment complex employee.[26] As Sgt. Flores walked away at 1:52:30 a.m.—Officer Alejandro signaled to Officer Villalobos that he had an opportunity to jump over the patio railing and rejoin his fellow officers.[27] Once Villalobos jumped over, Officer Villalobos told Officer Alejandro and all of the other officers on scene that he had just managed to unlock the patio door.[28] The officers stated aloud that they needed to relay that information to a sergeant on scene.

17.    Officer Alejandro briefly left to tell a sergeant that the patio door had been unlocked. He then returned to the patio.[29] After returning, other officers told Officer Alejandro at 1:54:24 a.m. that a bedridden man was in the apartment with Perez. On hearing that, Officer Alejandro exclaimed: "Oh shit, we *have* to make entry."[30]

> **f.  Sgt. Flores returned and was informed that the door was unlocked and that another person was in the apartment. Sgt. Flores told officers to keep Perez talking while they made a plan to detain Perez using less than lethal means.**

---

[26] **ROA.597**, *Flores BWC*, **14:35 – 14:45**.
[27] **ROA.598**, *Alejandro BWC*, **17:30 – 17:45**.
[28] **ROA.599**, *Villalobos BWC*, **14:08 – 14:30**.
[29] **ROA.598**, *Alejandro BWC*, **17:30 – 19:00**.
[30] *Id*. at **19:25 – 19:35**; *see also* **ROA.599**, *Villalobos BWC*, **15:45 – 15:55.**

18.    At 1:54:36 a.m., Sgt. Flores returned to the patio after speaking with an apartment maintenance worker.[31] As Sgt. Flores returned, he was told by his officers that Villalobos had managed to unlock the patio door. Sgt. Flores was also told that there was a bedridden man inside the apartment with Perez, and that Perez had come "right at" Officer Villalobos with a hammer when he had unlocked the door and that she was "ready to fight."[32]

19.    Sgt. Flores told officers that they would wait for shields and less lethal options if possible. Sgt. Flores openly worried aloud about the presence of the hammer with his officers. But Flores said "hopefully" they would be able to use a less lethal option. Sgt. Flores told officers to keep Perez talking to them. Finally, Sgt. Flores asked for confirmation that they knew "for sure" that the patio door was unlocked. The officers confirmed that the patio door was unlocked. [33]

> **g. From 1:55 a.m. until 2:01 a.m. the officers continued talking to Perez and attempted to persuade her to come out of her apartment peacefully. Meanwhile, Sgt. Flores spoke with others attempting to formulate a plan of entry.**

20.    Starting at 1:55:45 a.m., Officer Villalobos' began speaking with Perez again. As they spoke, Perez admitted that she was refusing to come outside because she did not want to be arrested.[34] Time passed, and Officer Villalobos disengaged from

---

[31] **ROA.597**, *Flores BWC*, **14:45 – 16:50**.
[32] *Id*. at **16:50 – 17:13**.
[33] *Id*. at **17:15 – 17:40**.
[34] **ROA.599**, *Villalobos BWC*, **17:15 – 17:55**.

Perez and began speaking with another officer. At 1:57:47 a.m., Officer Villalobos went to speak with Sgt. Flores—where he was discussing a plan of entry. Villalobos told Sgt. Flores that Perez did not have the hammer at the moment, and that he believed that they could go through the unlocked door and get to Perez before she rearmed herself. Officer Villalobos reiterated to Sgt. Flores that he knew the patio door was unlocked because "I unlocked it."[35]

21.    Simultaneously, Officer Alejandro spoke with another officer at 1:57:30 a.m. That officer told Alejandro that Perez had *twice* come close to hitting officers with a hammer as they tried to enter the apartment, stating that she came "sprinting with the fucking hammer."[36]

22.    At 1:59:00 a.m., Officer Villalobos returned to the patio railing. He asked Perez "before this has to get complicated, can you please just come out so we do not have to use force or anything like that?" Perez refused, stating that she had previously been arrested on "false accusations" and she was not going to "have it anymore."[37]

23.    At the same time, Officer Alejandro also walked up to the patio railing.[38] At 1:59:50 a.m., an officer told Perez, "it's either you come out and we arrest you, or

---

[35] *Id*. at **19:20 – 19:55**.
[36] **ROA.598**, *Alejandro BWC*, **22:45 – 23:00**.
[37] **ROA.599**, *Villalobos BWC*, **20:30 – 20:50**.
[38] **ROA.598**, *Alejandro BWC*, **24:15 – 24:45**.

we go in and we arrest you." Perez responded, "you know what, I'm not going that way. I'm not going 45 days again. For false accusations. Because I've been there done that three times."[39] Officer Alejandro then kept Perez talking by asking her hypotheticals about warrants.[40]

> **h. At 2:01:00 a.m. the officers on scene determined that they would move to enter the apartment to arrest Perez using the patio door that Officer Villalobos had unlocked.**

24.   At 2:01:00 a.m., Sgt. Flores' returned to the patio after a planning session.[41] As he approached, the footage shows that Sgt. Flores told most officers to back-up. Sgt. Flores told Officer Villalobos that he wanted him to "crossover" the railing and they would go through the "open" patio door.[42] Simultaneously, Sgt. Flores directed other officers to circle around back behind Perez's apartment and attempt to gain entry from the bedroom window.[43]

25.   At 2:01:50 a.m., Sgt. Flores approached Officer Alejandro from behind at the patio railing where Alejandro had been consistently speaking with Perez.[44] Sgt. Flores interrupted Alejandro mid-speech and told him they were getting ready to "go" and to keep talking with Perez.[45] Then, at 2:01:58 a.m., Officer Villalobos

---

[39] *Id*. at **24:50 – 25:25**.
[40] *Id*. at **25:25 – 25:40**.
[41] **ROA.597**, *Flores BWC*, **17:30 – 23:15** (from media player timestamp 21:00 to 23:08 Sgt. Flores' BWC does not capture sound).
[42] **ROA.597**, *Flores BWC*, **23:15 – 23:40**.
[43] **ROA.599**, *Villalobos BWC*, **22:45 – 23:00**.
[44] **ROA.598**, *Alejandro BWC*, **26:50 – 27:00**.
[45] **ROA.597**, *Flores BWC*, **24:00 – 24:06**.

began climbing over the patio railing.[46]  Perez pointed at Officer Villalobos and yelled "you ain't got no warrant!"[47]

### i.   The Use of Force Incident.[48]

26.    At **Flores 24:15**, Sgt. Flores can be heard saying "lets go" as Officer Villalobos climbed over the railing. At **Villalobos 23:31**, Officer Villalobos completed his climb over the railing and landed on the enclosed concrete patio. At **Alejandro 27:13**—the footage shows that  Perez disappeared from where the top of her head could be seen above the television through the completely open window. At **Alejandro 27:16**, at 2:02:06 a.m.,  Perez can be seen through her open window with her arm cocked above her head *charging* towards Officer Villalobos as he reached toward the patio door's handle.[49] In that absolute split second at **Alejandro 27:17**—at 2:02:07 a.m.—Officer Alejandro opened fire on  Perez in response to this charge. It is undisputed that all of these shots missed.[50]

27.    At 02:02:09 a.m.—at **Flores 24:22** and **Villalobos 23:38**—the footage depicts that both officers took cover on the far-right side wall of the enclosed patio. Officer Villalobos' BWC depicts that  Perez fled further back into her apartment. However, by **Villalobos 23:39**,  Perez had already turned back around to watch the officers at

---

[46] *Id*. at **24:11**; *see also* **ROA.599**, *Villalobos BWC*, **23:27**.
[47] *Id*. at **24:13**.
[48] For the purposes of this subsection, the BWC Footage will be cited using the Officer's name and the media timestamp.
[49] *See also* **ROA.600**, *Alejandro Still Frames*, **pgs. 1 – 3**.
[50]

her patio door. At 2:02:11 a.m.—at **Villalobos 23:40**—Officer Villalobos moved to the left side of the door to again reach for the handle of the patio door. This reposition gave Sgt. Flores's BWC a perfect view into Perez's apartment.

28.     At 2:02:12 a.m.—at **Flores 24:26**— Perez responded to Officer Villalobos' reaching for the handle of the door a second time by screaming "hey hey" and ***charging*** at the officers ***a second time***. The charge was immediate and swift, and Sgt. Flores and Officer Alejandro made the split-second decision to shoot Perez. She was shot at **Flores 24:27,** at 2:02:13 a.m., while she was mid-charge and mid-swing of her hammer.

14



Flores Body-Cam 2:02:12 a.m.



Flores Body-Cam 2:02:12 a.m.



Flores Body-Cam 2:02:13 a.m.



Flores Body-Cam 2:02:13 a.m.

 

Flores Body-Cam 2:02:13 a.m.          Flores Body-Cam 2:02:13 a.m.

 

Flores Body-Cam 2:02:13 a.m.          Flores Body-Cam 2:02:14 a.m.
(Shots Fired)

*Demonstrative Still Frames*

    j.  **Aftermath**.

29.    The officers immediately entered the apartment in order to render emergency aid. Before they could make entry, Officer Villalobos had to kick the patio door until some of the shattered glass fell away, at which point he was able to reach through

16

one of the open panels to unlock the patio door—revealing that Perez had either relocked it at some point during the standoff unbeknownst to the officers or a second lock on the door prevented entry.

30.    Simultaneously, the officers Sgt. Flores had sent around the back of Perez's apartment shouted, "we're in, we're in" and they appeared in the living room from the hallway.[51] Officers then began rendering emergency aid to Perez. During Sgt. Flores' sweep of the apartment, he found the bedridden man in a bedroom in the back—who was seemingly unable to move or get up despite the loud events of this tragic early morning.[52]

31.    From the video footage of the medical assistance  Perez received immediately after the officers made entry into her apartment, she was hit by two bullets. One from Sgt. Flores and one from Officer Alejandro.[53] Though Officer Villalobos also opened fire, it is undisputed that Officer Villalobos never struck Perez.[54]

32.    Much later, after these Officers had removed themselves from the scene, Sgt. Flores asked Officer Villalobos why the patio door would not open. Officer Villalobos responded that he believed an additional lock prevented entry, stating

---

[51] **ROA.599**, *Villalobos BWC*, **23:50 – 24:10**.
[52] **ROA.597**, *Flores BWC*, **27:06**.
[53] **ROA.801** (district court's order summarizing these facts).
[54] **ROA.801** (the district court noting that it was undisputed that "[n]one of the shots fired by Officer Villalobos struck Perez); *see also* **ROA.661** at n.1 (Tovar conceding this fact).

17

"there w[ere] three locks on it; so the one I had originally unlocked, there was one above that one too."[55]

## B. Procedural History

33.   Since Appellees' are dissatisfied with some of Appellants' recitation[56] of the relevant procedural history and characterizations of the district court's rulings presented for review—Appellees provide their own pursuant to Rule 28.[57]

### a.   The First Motion to Dismiss.

34.   Tovar filed her Original Complaint on July 7, 2023. That same month, she filed her First Amended Complaint on July 25, 2023.[58] Against these Officers, Tovar asserted one "Count" pursuant to 42 U.S.C. §1983. She alleged that these Officers' violated Perez's Fourth Amendment right to be free from excessive force.[59]

35.   On November 9, 2023—these Officers and former Defendant Villalobos filed their Motion to Dismiss Tovar's First Amended Complaint, asserting they were entitled to qualified immunity. The first motion did not attach Body-Camera evidence. Instead, it argued for immunity based on Tovar's pleadings and an

---

[55] **ROA.597**, *Flores BWC*, **33:11 – 33:26**; **ROA.801** at n. 7 (district court notating this exchange in its order).
[56] Appellants' Br. 12 – 14 (procedural history), .
[57] FED. R. APP. P. 28(a)(6); *see also* FED. R. APP. P. 28(b).
[58] **ROA.3** (docket sheet).
[59] **ROA.91**.

attached probable cause affidavit that Tovar incorporated into her First Amended Complaint.[60]

36.    After the parties fully briefed the motion—during which Tovar filed a Second Amended Complaint[61] that did not moot the pending motion—the Magistrate Judge issued a Report and Recommendation on July 3, 2024.[62] Within, the Report recommended that Tovar's pleadings, accepted as true, plausibly pled that these Officers and Villalobos used excessive force, violating Perez's Fourth Amendment rights, and they were thus not entitled to qualified immunity on the first prong of the defense.[63] However, the Report found that the Officer *were* entitled to qualified immunity under the second prong of the defense.

37.    The Report found that the law was not clearly established at the time that it was unconstitutional for Officers to use deadly force on a "mentally unstable suspect armed with a weapon like a hammer, repeatedly rushing at the officers while separated by barriers that more-or less readily can be broken or removed."[64] The Report therefore determined that the Officers' motion be granted on the grounds of qualified immunity. But the Report recommended the district court allow Tovar to file a Third Amended Complaint that retracted allegations incorporated by reference

---

[60] **ROA.141** (first motion to dismiss); **ROA.97 – 99** (probable cause affidavit that lead to the arrest of these Officers in Bexar County, Texas).
[61] **ROA.338**.
[62] **ROA.386 – 403**.
[63] **ROA.397**.
[64] **ROA.401**.

to the probable cause affidavit—namely that Perez charged these Officers with a hammer in the moments before deadly force was used.[65]

38.    On September 23, 2024, the district court overruled objections to the Report and Recommendation, adopted the report, and permitted Tovar to file a Third Amended Complaint.[66]

### b.    The Second Motion to Dismiss.

39.    On December 13, 2024, Tovar filed her Third Amended Complaint.[67] In so doing, Tovar failed to replead her claims against Officer Villalobos. He was accordingly "amended out" as a defendant in this litigation.[68] In her Third Amended Complaint, Tovar referenced the existence of "body camera footage" and asserted that it supported her excessive force claim against the remaining defendants—Sgt. Flores and Officer Alejandro.[69]

40.    On January 17, 2025, these Officers filed their Second Motion to Dismiss and attached as evidence the footage from their Body-Worn Cameras.[70] The Officers argued that the footage was appropriately considered at the 12(b)(6) stage of this

---

[65] **ROA.401**.
[66] **ROA.493 – 495**.
[67] **ROA.498**.
[68] **ROA.792** (the district court noting that Villalobos was no longer a defendant as of the Third Amended Complaint).
[69] *See e.g.* **ROA.505**.
[70] **ROA.603**.

litigation under this Court's precedents.[71] Tovar conceded that the video evidence should be reviewed.[72]

41.    With this video evidence before the district court, these Officers reasserted their argument that they were entitled to qualified immunity under the first prong of the qualified immunity defense. The Officers argued that they did not violate Perez's Fourth Amendment rights when they used deadly force, because objectively reasonable officers could believe deadly force was necessary to protect themselves from the imminent threat  Perez posed as she charged at them a second time while swinging a hammer.[73] These Officers also argued that they were again entitled to qualified immunity under the second prong of the defense. The motion asserted that the law was not clearly established that officers could not use deadly force to protect themselves from a suspect charging at them with a hammer simply because there was a pane glass door and an open window between them and their attacker.[74]

### c.  The District Court's Ruling Presented for Review.

42.    On May 28, 2025, the Magistrate Judge issued a second Report and Recommendation.[75] On September 28, 2025, the district court accepted this Report *in toto* and adopted it as its own Order.[76]

---

[71] **ROA.605** (citing *Winder v. Gallardo*, 118 F.4th 638, 643 (5th Cir. 2024)).
[72] **ROA.794**
[73] **ROA.620**.
[74] **ROA.623 – 624**.
[75] **ROA.737 – 757**.
[76] **ROA.782**.

43.    The district court granted the motion to dismiss after it determined that these Officers were entitled to qualified immunity under both prongs of the defense.[77]

44.    As to the first prong, the district court held that these Officers did not violate Perez's Fourth Amendment rights when they used deadly force. The district court found that the BWC footage revealed that "Perez was both armed and moving aggressively towards the officers at the time of the shooting."[78] The court ruled that Perez was "certainly agitated, mentally unstable, shouting, and brandishing a hammer." Perez was "also armed, suffering a schizophrenic episode, had already acted violently toward the officers, and was sprinting toward Sergeant Flores and Officer Villalobos when she was shot."[79] Under this Circuit's precedents, the district court found that similar acts presented an imminent threat warranting deadly force.

45.    However, the district court determined that "the question the Court must confront is whether the glass-paneled door makes any difference" that might distinguish past precedents.[80] The district court wrote "[c]onsidering the totality of the circumstances, the fact that there was a glass-paneled door between Perez and the Defendant Officers does not change the Fourth Amendment analysis."[81]

46.    The district court explained:

---

[77] **ROA.802**.
[78] **ROA.804**.
[79] **ROA.804**.
[80] **ROA.805**.
[81] **ROA.805**.

Reasonable officers in the shoes of the Officer Defendants would have believed that Perez was charging at them through an unlocked door; absent deadly force, they could not have kept Perez out of the enclosed patio except by holding onto the doorknob and trying to keep the door shut, which would have exposed them to hammer strikes by Perez through the glass panels.

It is also reasonable to believe that retreat was not an alternative, because the officers might not have been able to extricate themselves safely from the relatively confined space of the patio without being exposed to hammer attacks from behind by a charging Perez. Indeed, the video footage demonstrate that, because the patio railing was high, climbing over it was cumbersome and required both hands.[82]

47.     Putting it all together, the district court ruled that under the totality of the circumstances and given "Perez's earlier attempts to assault Officer Villalobos and another officer with the hammer, and her attack on the other officer with a glass candle" the court would not "deem [these Officers'] split-second decision to shoot an unreasonable use of deadly force, despite its tragic consequences."[83]

48.     On second prong, the district court held that "the facts alleged by Plaintiffs' case still fail to overcome the 'clearly established' prong of the qualified immunity defense."[84] The district court disposed of the "three rules" that Tovar proffered below, and which she reasserts here on appeal.[85] The district court found that none

---

[82] **ROA.806 – 807** (cleaned up).
[83] **ROA.807**.
[84] **ROA.807**.
[85] **ROA.808 – 810**; *see also* Appellant's Br. 44 – 47.

23

of the case law precedents Tovar proffered to support these rules were probative of the *particular* violative conduct at issue in this case.

49.   In a footnote, the district court disposed of Tovar's argument that her case was an 'obvious' case that exempted her from the "burden of demonstrating that the law was clearly established by a similar case."[86] The district court reminded that "the standard for obviousness is sky high" and that Tovar's pleadings—as informed by the video evidence—failed to meet that daunting criteria.

---

[86] **ROA.810** at n. 18.

## SUMMARY OF THE ARGUMENT

50.    **First**, this Court should affirm the district court's determination that Sgt. Flores and Officer Alejandro are entitled to qualified immunity on the first prong of the defense. The clear video evidence in this case reveals that objectively reasonable officers could believe that deadly force was imminently necessary to stop the erratic and violent Perez from charging them and attacking with a deadly weapon—in this case a hammer.

51.    On appeal, Tovar meritless disputes the district court's ruling that Perez's conduct amounted to an immediate threat of serious harm under the second *Graham* factor. The assessment of the threat posed by a suspect is a question of law for the Court, and under the totality of the circumstances, any reasonable officer would view Perez's first ***and second*** charge with an upswung hammer as a violent attack with a deadly weapon. Tovar's proffer that Perez's subjective intentions for charging were harmless is frivolous as a matter of fact and law.

52.    Additionally, the district court correctly held that objectively reasonable officers could believe that Perez's attack posed an *immediate threat* under the facts revealed by the clear video evidence—despite the glass-paneled patio door and the other environmental factors that surrounded these Officers when they used lethal force.

25

53.    Tovar argues these Officers acted unreasonably because she plead that they subjectively knew that the patio door was locked. Again, this subjective proffer is meritless as a matter of law and under the facts depicted by the clear video evidence. To the contrary, this Court and the United States Supreme Court have consistently held that the Fourth Amendment asks only what an objective officer in the defendant's position would have reasonably believed. The videos show that reasonable officers would not have had time to comprehend the door was locked.

54.    **As a matter of first impression**, this Court should issue guidance on what the Fourth Amendment requires of officers when **(1)** it is objectively reasonable to believe they are the target of an ongoing attack by a suspect with a deadly weapon; but **(2)** a §1983 plaintiff argues the officers unreasonably used force because they *should* have realized that a nearby environmental factor could have protected them. Said differently, can an officer be the subject of an attempted attack with a deadly weapon, but simultaneously not be under an "immediate threat" pursuant to *Graham*'s second factor? This Court should answer "no."

55.    This confuses the *immediacy* of a deadly threat with the threat's *chance* of success. Officers risk their lives every day to protect and serve. The Fourth Amendment should not require them to endure that risk with anything but dice loaded in their favor. Even if an attack with a deadly weapon poses only a small

26

chance of landing a harmful blow, such a threat should still satisfy the immediacy requirement of *Graham*'s second factor.

56.    **Second**, the district court correctly found that these Officers were entitled to qualified immunity on the second prong of the defense. Tovar's proffered "Rules" are untethered from the authorities she references, and the district court ably distinguished these cases from the facts presented here.

57.    Finally, this is not an obvious case. This Court should decline to excuse Tovar from her burden of demonstrating that the law was clearly established by a similar case that the specific violative conduct at issue here was unconstitutional.

## LEGAL STANDARDS

### A. Rule 12(b)(6) Standard of Review.

58.    This Court reviews a Rule 12(b)(6) dismissal *de novo*.[87] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[88] But this court does not presume true a number of categories of statements, including legal conclusion; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement."[89]

---

[87] *Anderson v. Estrada*, 140 F.4th 634, 641 (5th Cir. 2025), cert. denied, No. 25-403, 2025 WL 3260215 (U.S. Nov. 24, 2025); FED. R. CIV. P. 12(b)(6).
[88] *Id*. (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).
[89] *Id*. (citing *Armstrong v. Ashley*, 60 F.4th 262, 269 (5th Cir. 2023)).

59.     "Moreover, where video recordings are included in the pleadings, as is the case here, the video depictions of events, viewed in the light most favorable to the plaintiff, should be adopted over the factual allegations in the complaint if the video blatantly contradicts those allegations."[90]

## B. Qualified Immunity.

60.     Officers are entitled to "qualified immunity at the motion-to-dismiss stage unless plaintiffs have alleged facts sufficient to plausibly show that (1) the defendants conduct violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged misconduct."[91] This Court, in its sound discretion, may decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[92] If this Court decides either prong in these Officers' favor, it need not address the other prong.[93]

## ARGUMENTS & AUTHORITIES

**A. Issue 1: Objectively reasonable officers could believe that deadly force was imminently necessary to stop the erratic and violent Melissa Perez from charging and attacking with a hammer. The district court correctly awarded that these Officers qualified immunity under the first prong of the defense.**

---

[90] *Id.* (cleaned up) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).
[91] *Id.*
[92] *Anderson*, 140 F.4th at 642.
[93] *Id.*

28

61.    This Court should affirm the district court's finding below on Tovar's first issue presented. Under the totality of the circumstances, these Officers did not violate Melissa Perez's Fourth Amendment rights. Objectively reasonable officers could believe deadly force was imminently necessary to stop the erratic and violent Perez from charging and attacking with a hammer.

   **a. Tovar's appeal only challenges the district court's findings under the second *Graham* factor. Under the Fourth Amendment's objective reasonableness standard, officers may use deadly force when they have reason to believe that the suspect poses a threat of serious harm to the officer or to others**. **The assessment of the threat posed by the suspect is a question of law for this Court.**

62.    By its silence, Appellant Tovar's Brief makes clear that she is only challenging the district court's judgment on the second *Graham* factor. By failing to brief the first and third *Graham* factors, those challenges are waived.[94]

63.    "Excessive force claims are properly analyzed under the Fourth Amendment's reasonableness standard."[95] The standard for judging the objective reasonableness of force is controlled by the three *Graham* factors articulated by the United States Supreme Court.[96] *Graham* teaches that the "reasonableness of a particular use of

---

[94] *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 177 (5th Cir. 2020) ("An appellant can intentionally waive or inadvertently forfeit the right to present an argument by failure to press it on appeal, a higher threshold than simply mentioning the issue.").

[95] *Bakutis v. Dean*, 129 F.4th 299, 306 (5th Cir. 2025) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

[96] Determining whether an officer's use of force was objectively reasonable requires careful attention to the facts and circumstances of each particular case. The *Graham* factors are (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety

force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[97] "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[98]

64.    But in cases where law enforcement has used deadly force, this Court has stated it is well settled that "the second [*Graham*] factor—whether there is an immediate threat to safety—is generally the most important factor in determining the objective reasonableness of an officer's use of deadly force."[99]

65.    Thus, "[a]n officer's use of deadly force is not unreasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others."[100] But the "assessment of whether a suspect's physical actions amount to threatening behavior bearing on an excessive-force claim is a question of law" for the Court to decide.[101]

> **b. Under the totality of the circumstances, objectively reasonable officers could view Melissa Perez's reckless charge while raising her hammer as an imminent attack threatening serious harm as a**

---

of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

[97] *Graham*, 490 U.S. at 396.

[98] *Id.* at 396 – 97.

[99] *Baker v. Coburn*, 68 F.4th 240, 247 (5th Cir. 2023), as revised (May 19, 2023).

[100] *Argueta v. Jaradi*, 86 F.4th 1084, 1088 (5th Cir. 2023) (citing *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2023) (sword)).

[101] *Terrell v. Allgrunn*, 114 F.4th 428, 438, n. 6 (5th Cir. 2024) (citing *Argueta*, 86 F.4th at 1090 (5th Cir. 2023).

**matter of law—despite the glass-paneled patio door between Perez and these Officers.**

66.    It is well established in this Circuit that law enforcement may reasonably use deadly force when a suspect threatens an officer with a deadly weapon other than a gun.[102] In *Mace,* this Court held that the suspect did not even have to be charging at the officers for the use of deadly force to be constitutional.[103] Here, the video clearly shows that Perez charged with a hammer, but Appellant Tovar disputes that this act was a threat and charges that the district court did not evaluate the totality of the circumstances.[104]

67.    In *Barnes*, the United States Supreme Court clarified that the Fourth Amendment's "totality of the circumstances inquiry into a use of force has no time limit."[105] The precise time of the shooting still matters most, but "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones."[106] Crucially to the case at hand, *Barnes* teaches that "[p]rior events may show, for example, why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening."[107]

    i.    **Perez's prior conduct was so violent and angry that no reasonable officer could view her charge with the hammer as**

---

[102] *See, e.g. Mace v. City of Palestine*, 333 F.3d 621, 624 – 25 (5th Cir. 2003)
[103] *Id.*
[104] Appellant's Br. at 37.
[105] *Barnes v. Felix*, 605 U.S. 73, 80 (2025).
[106] *Id.*
[107] *Id.*

**anything but a violent attack. Appellant's subjective proffer of Perez's intentions are impermissible under the law.**

68.     Tovar argues in her Brief that the district court wrongly ruled as a matter of law that Perez's actions were threatening. Tovar asserts she is entitled to the subjective interpretation that act as she plead it in her complaint. Namely, she pleads Perez was "not trying to reach the officers or attempting to attack them."[108] She concludes by proffering that the totality of the circumstances "leads to no conclusion other than Perez was trying to stay away from the officers."[109]

69.     This argument is frivolous both under the facts and the law. Take the facts first. Tovar's claim that Perez was trying to "stay away" from the officers is blatantly contradicted by the videos.[110] The footage shows that she ran *towards* the officers with a hammer in the split second before she was shot.[111] Furthermore, with *Barnes* allowing review of the totality of this incident, Perez's prior conduct was so atrociously violent and erratic that no reasonable officer would have viewed her rushing towards them with an upswung hammer as ***anything*** other than an attempt at a violent attack.

70.     The district court summarized Perez's prior conduct perfectly. She was agitated, mentally unstable, shouting, and brandishing a hammer throughout. Prior

---

[108] Appellant's Br. 35.
[109] *Id*. at 36.
[110] *Scott*, 550 U.S. at 380.
[111] **ROA.597**, *Flores BWC*, **24:26 – 24:27**.

to this use of force, Perez had *successfully* attacked an officer by throwing a candle at him through her open window. She also *attempted* to strike Officer Villalobos with her hammer when Villalobos unlocked a bolt on her patio door through that same open window.[112] At bottom—if *Barnes* permits the Court to evaluate how threatening an objectively reasonable officer would view a suspect is by prior conduct—the footage of Perez's behavior would put any such officer on notice that she was a threat as a matter of law under these facts.

71.    Now take the law. Tovar's Brief insists that she is entitled to escape dismissal because she plead Perez's subjective intentions were harmless—despite this video footage. But this is the wrong standard as a matter of law, and Circuit precedent forecloses this argument. As this Court explained in *Cloud*, "we measure excessive force by the objective circumstances, not by the subjective intentions of the arrestee."[113] Likewise in *Griggs*, this Court heard a similar argument and rejected it as the wrong standard. There, the plaintiff argued that "due to ambiguities in the video" a "reasonable jury" might find that that the plaintiff was not *intentionally* resisting arrest but instead drunkenly pulled away from the officer.[114]

---

[112] **ROA.804 – 805** (the district court summarizing these facts).
[113] *Cloud v. Stone*, 993 F.3d 379, 386 (5th Cir. 2021); *see also Tucker v. City of Shreveport*, 998 F.3d 165, 181 (5th Cir. 2021) (holding qualified immunity was appropriate because it was irrelevant if the suspect intentionally meant to kick law enforcement).
[114] *Griggs v. Brewer*, 841 F.3d 308, 314 (5th Cir. 2016).

72.    The *Griggs* Court held that it was irrelevant if a jury *might* believe this subjective proffer, as that was not the proper inquiry. Instead, the "court must measure the force used under the facts ***as a reasonable officer would perceive them***, not necessarily against the historical facts.[115] Tovar's block quote of her pleadings in her Brief—which proffers Perez's subjective intetions—is accordingly immaterial to the Fourth Amendment analysis.[116] Instead, the Supreme Court's precedent in *Tolan* reveals that the question that bids this Court's attention is if, in light of the video evidence, a reasonable jury could find that an objectively reasonable officer could *not* have perceived that Perez was attacking with a hammer.[117] On this score, there is no *genuine* fact question, and this argument should be overruled.

> **ii.    The district court correctly held that objectively reasonable officers could believe that Perez's attack posed an immediate threat as a matter of law under these facts, despite the glass-paneled patio door and other environmental factors.**

73.    Having established that reasonable officers could objectively view Perez's charge with her hammer as an attack—the question becomes could any objectively reasonable officer view the attack as posing an "immediate threat" of serious

---

[115] *Id.* (emphasis added).

[116] Appellant's Br. 35.

[117] *Tolan v. Cotton*, 572 U.S. 650, 658 (2014) (The Supreme noting that the question on summary judgment was if "a jury could reasonably infer that [the suspect's] words, in context, did not amount to a statement of intent to inflict harm" and that the ultimate question was if "a reasonable officer would have heard [the suspect's] words [] as a threat…".) (cleaned up).

harm.[118] In her Brief, Tovar asserts numerous arguments that essentially contend the district court erred when it found that objectively reasonable officers *could* view the attack as posing an immediate threat.[119] Putting aside Tovar's frivolous argument that officers could not view this as an attack at all, Tovar is essentially arguing that these officers should have realized that various environmental factors—such as the presence of the patio door—would have protected them from Perez's attack or permitted them to retreat away from the attack.[120]

74.     Below, the district court comprehensively analyzed the environmental factors that surrounded these Officers during the split-second Perez charged at them with an upswung hammer. Those factors included: (1) whether objectively reasonable officers in Sgt. Flores and Officer Alejandro's position could believe the patio door was unlocked; (2) whether officers could have safely kept the door closed without being struck; and (3) whether the chest high patio railing prevented these Officers' from safely retreating from this attack.[121]

75.     The district court held that every single one of these environmental factors fell in favor of these Officers' decision to use of deadly force to stop an immediate threat.

---

[118] *Ramirez v. Granado*, 163 F.4th 204, 208 – 209 (5th Cir. 2025) (analyzing a fact pattern where a suspect initially "moved towards" officers—which prompted a shot that missed—contrasted with six more shots that followed once the suspect had started running away. Determining a fact question prevented immunity because the threat posed by the suspect might have no longer been "immediate.").

[119] Appellant's Br. 29 – 34 (subsections "a" – "c").

[120] *Id.*

[121] **ROA.805 – 806**.

Appellees adopt the district court's analysis here, as the arguments Tovar's Brief raises to challenge the district court's Order are clearly contradicted by the video evidence. These Officers will only brief argument against Tovar's contention that the district court should reverse because these Officers allegedly subjectively knew that the patio door was actually locked before they used deadly force.

### c. Tovar's argument that these Officers subjectively knew that the patio door was locked is meritless as a matter of law under the facts revealed by the clear video evidence.

76.    The district court held that the presence of the patio door did not change the Fourth Amendment analysis in part because objectively reasonable officers could have "believed that Perez was charging at them through an unlocked door."[122] Tovar argues that the district court erred because she plead that Sgt. Flores and Officer Alejandro individually and subjectively knew the door was locked.[123]

77.    Tovar's argument again does not contend with the proper standard. In *Winder*, this Court considered body-camera footage at the 12(b)(6) stage. In holding that the officer was entitled to qualified immunity, this Court reiterated that the Fourth Amendment test asks "what a reasonable officer in [the defendant's] position would have reasonably believed…".[124] Accordingly, the Fourth Amendment question that

---

[122] **ROA.805**.
[123] Appellant's Br. 29.
[124] *Winder v. Gallardo*, 118 F.4th 638 (5th Cir. 2024), *cert denied,* 145 S. Ct. 2816 (2025).

bids this Court's attention is satisfied if the video evidence establishes that a reasonable officer *could* have believed the door was unlocked.

78.    It is undisputed that Officer Villalobos told Sgt. Flores and Officer Alejandro that he had unlocked the patio door[125] and that the officers ultimately made a plan and attempted to enter Perez's apartment under the assumption that the door was unlocked.[126] The video evidence thus reveals that all of these officers believed that Perez's door was unlocked before they attempted to make entry.

79.    On Officer Alejandro's BWC at the **27:15** timestamp, Officer Villalobos clearly reached out and attempted to open the door. A second later, at **27:16**—Officer Villalobos had to let go of the doorknob in order to retreat from Perez's first charge with her hammer.[127]

80.    After the first charge, Officer Villalobos *returned* to the door, placed his hand on the doorknob a second time, and again tried to open the door. At **Alejandro 27:21**, Villalobos put his hand on the doorknob a second time, making a second attempt at opening the door he had stated that had unlocked. At **Alejandro 27:22**, Villalobos is again depicted attempting to turn the doorknob.[128] A split second later, at **Alejandro 27:23**, Officer Villalobos was again forced to let go of the doorknob

---

[125]**ROA.597**, *Flores BWC*, **20:20 – 34**.
[126] *Id*. at **20:56 – 21:10**.
[127]**ROA.598**, *Alejandro BWC*, **27:15 – 16**.
[128] The doorknob is visible in the very top right of the footage.

and retreat as  Perez charged *a second time* with her hammer.[129] At no point in time did Villalobos announce to his fellow officers that the door was locked.

81.    Much later—Sgt. Flores *still* did not know why the door had not opened. As the district court's order correctly noted in footnote seven, Sgt. Flores later had to ask Officer Villalobos why the door would not open. At that time, Villalobos stated that there were additional locks on the door that had remained locked.[130] Accordingly, the video evidence clearly shows that an objectively reasonable officer could believe that the door was unlocked.

82.    Read charitably, Tovar's argument on appeal insists that every reasonable officer—in a split second while contending with charging and hammer-wielding assailant—had to realize that the door was actually locked in those tense and rapidly unfolding seconds. That position is untethered from any case law and the reality depicted by the videos. This argument should be overruled.

83.    For all of these reasons, this Court should affirm the district court below on the first prong of the qualified immunity defense—as no Constitutional violation occurred here.

    **B. Response Issue: As a matter of first impression, if an objectively reasonable officer could believe they are the target of an ongoing attack with a deadly weapon, this Court should hold that the Fourth Amendment does not require officers to make granular split-second calculations to determine if the attack will miss or otherwise be rendered**

---

[129] *Id*. at **27:15 – 27:23**.
[130] **ROA.597,** *Flores BWC*, **33:11 – 26**.

**ineffective by environmental factors in order for the attack to be deemed an "immediate threat."**

84.    "This court may affirm a district court's dismissal of a suit for failure to state a claim on any basis supported by the record."[131] These Officers accordingly submit that this case poses a matter of first impression for the Circuit and invite the Court to consider an alternative basis to uphold the district court's dismissal.

85.    What does the Fourth Amendment require of officers when: **(1)** it is objectively reasonable to believe they are the target of an ongoing attack by a suspect with a deadly weapon; but **(2)** a §1983 plaintiff argues that officers unreasonably used force because officers *should* have realized that nearby environmental factors would have protected them from that attack?

86.    Said differently, can an officer be the subject of an attempted attack with a deadly weapon, but simultaneously not be under an "immediate threat" pursuant to *Graham*'s second factor?[132]

87.    The undersigned proffers that the answer is "no." These Officers make this argument cognizant that the Supreme Court mandates that the Fourth Amendment requires a court to "slosh its way through a factbound morass."[133] However, if this Court has already determined that objectively reasonable officers could believe

---

[131] *Favre v. Sharpe*, 117 F.4th 342, 346 (5th Cir. 2024).
[132] *Barnes v. Felix*, 152 F.4th 669, 674 (5th Cir. 2025).
[133] *Barnes*, 605 U.S. at 80.

themselves the target such an attack with a deadly weapon, this Court will have already waded waist deep into the factual quagmire.

88.   At bottom, this Court should not require officers in the midst of an attack to simultaneously make granular split-second calculations to determine if that attack is *likely* to land or be otherwise be mitigated by an environmental factor. This proposition is a close cousin to precedents this Court has long espoused.

89.   For example, in *Winder*, this Court reminded that "[u]ses of force may be reasonable when the officer could reasonably believe the suspect was reaching for or had a gun" even if the suspect was later found to actually be unarmed.[134] And though the moment of the threat doctrine has been overruled, it remains good law that "whether an officer was in actual, imminent danger of serious injury" is irrelevant.[135] Instead the Fourth Amendment asks "whether the officer reasonably believed that the suspect posed a threat of serious harm to the officers."[136] Finally, *Graham* has long held that it impermissible to judge force "with the 20/20 vision of hindsight."[137]

90.   The Officers raise this argument out of concern that the district court engaged in hypothetical ways the patio door could have protected them from a deadly attack

---

[134] *Winder*, 118 F.4th at 646.
[135] *Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014), abrogated on other grounds by Barnes v. Felix, 605 U.S. 73 (2025)).
[136] *Id.*
[137] *Graham*, 490 U.S. at 396.

after the district court had already determined that the Officers could reasonably believe Perez was actively charging them with a hammer.[138] The district court went so far as to ponder if the officers could have used the environment to protect themselves from the hammer by holding the patio door shut with the door handle. On appeal, Tovar now challenges that holding by claiming these Officers could have used their feet to keep it closed.[139] This parade of horribles could march endlessly. Taken to its logical conclusion, Officers behind bullet proof glass could be prohibited from returning fire at a suspect if a plaintiff claimed they should have calculated that the suspect's firearm was of an insufficient caliber to penetrate that protection.

91.    To the undersigned, this confuses the *immediacy* of a deadly threat with the threat's *chance* of success. Officers risk their lives every day to protect and serve. The Fourth Amendment should not require them to endure that risk with anything but dice loaded in their favor. Even if an attack with a deadly weapon poses only a small chance of landing a harmful blow, such a threat should still meet the *immediacy* requirement of *Graham*'s second factor.

**C. Issue 2: The district court correctly found that these Officers are entitled to qualified immunity on the second prong of the defense. Tovar's proffered "Rules" are untethered from the case law and this is not an obvious case.**

---

[138] **ROA.805**.

[139] Appellant's Br. 33 (arguing "[t]he officers certainly could have prevented the door from opening…by placing their foot on the door…").

41

92.    The second prong of the qualified immunity defense, "whether the officer violated clearly established law—is a doozy."[140] The §1983 plaintiff bears the burden of proof, "[a]nd that burden is heavy: A right is clearly established only if relevant precedent has placed the constitutional questions beyond debate."[141] In *Morrow* this Court exhaustively laid out the "four applicable commandments" that a plaintiff must satisfy to establish that the constitutional question is "beyond debate."[142]

      **a. This is not an obvious case. This Court should accordingly not excuse Tovar from her burden of demonstrating that the law was clearly established by a similar case.**

93.    In her Appellant's Brief, Tovar attempts to excuse herself from her burden by realleging her argument that this is an "obvious" case that can be governed only by *Garner*.[143] The district court appropriately disposed of this argument in a footnote.[144] The standard for obviousness is sky high. So rare that this Court noted in *Harmon* that the Supreme Court has never identified one in the context of excessive force.[145]

---

[140] *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019).
[141] *Id.*
[142] *Id.*
[143] Appellant's Br. 39 (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)); *see also Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (teaching *Garner* does not create clearly established law outside an obvious case).
[144] **ROA.810** at n. 18.
[145] *Id.* (citing *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1167 (5th Cir. 2021).

94. As in *Harmon*, because these officers "faced an all too obvious threat of harm, further speculation that *Garner*" is sufficient to meet her burden is frivolous.[146]

> **b. Plaintiffs' proffered "Rules" are untethered from the case law and the district court below ably distinguished them from these facts. Thus, no clearly established law has placed the unconstitutionality of these Officers' conduct "beyond debate."**

### i. First Rule

95. Tovar cites *Roque, Mason* and *Lytle* for the proposition that these Officers violated clearly established law because these cases stand for the proposition that Officers cannot shoot a suspect who is "functionally unarmed." The district court rebutted this proffered rule.[147] Perez had a hammer. She was accordingly armed.

### ii. Second Rule.

96. Second, Tovar cites *Crane* for the proposition that these Officers cannot be granted qualified immunity because they had non-lethal means available, either retreat or the use of non-lethal weapons.[148] The district court correctly explained below that *Crane* stood for an inapposite position that "officers may not use deadly force on an unarmed man in a parked car."[149]

### iii. Third Rule.

---

[146] *Id.*
[147] **ROA.809**.
[148] Appellants' Br. 45.
[149] **ROA.809.**

43

97.    Finally, Tovar cites *Lytle, Reyes, Bacque and Amador* for the proposition that officers may not shoot a suspect who is too far away to pose a threat.[150] Again, the district court succinctly dismissed this argument. It is beyond dispute that Perez was close enough to be a threat in her apartment. For example, the footage clearly shows that these Officers were informed that Perez had successfully injured one of their fellows with a glass candle earlier that night from inside that apartment.

### CONCLUSION & PRAYER

98.    Because Appellant has not demonstrated any reversible error in the District Court's judgment or its rulings on the Motion to Dismiss, this Court should affirm the judgment below.

Respectfully submitted,

**WRIGHT & GREENHILL, P.C.**
4700 Mueller Blvd., Suite 200
Austin, Texas  78723
(512) 476-4600
(512) 476-5382 – Fax

By:    /s/ Stephen B. Barron
    Stephen B. Barron
    State Bar No. 24109619
    sbarron@w-g.com
    Blair J. Leake
    State Bar No. 24081630
    bleake@w-g.com

**ATTORNEYS FOR APPELLEES**

---

[150] Appellants' Br. 46.

44

## CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 32.2 and 32.3, the undersigned certifies that this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B), and pursuant to 5th Cir. R. 32.1 and 32.3, the undersigned certifies that this brief complies with the type-face requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6).

1. Exclusive of the exempted portions in 5th Cir. 32.2, this Brief Contains:

   a. **9,500** words, which is less than the limit of 13,000 words.

2. This Brief was prepared:

   a. In proportionally spaced **Times New Roman typeface** using **Microsoft Word 365** for Macintosh Computers. **14-point font** was utilized for the body of the Brief. **12.5-point font** was utilized for the footnotes.

/s/ Stephen B. Barron
Stephen B. Barron

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of February 2026, a true and correct copy of the foregoing Brief of Appellees was electronically filed with the Clerk for the Fifth Circuit Court of Appeals via the CM/ECF E-Filing system, and was E-Served upon all counsel of record through the CM/ECF E-Filing system, in accordance with Federal Rule of Appellate Procedure 25(c)(2).

/s/ Stephen B. Barron
Stephen B. Barron